No. 1-04-2709

SIXTH DIVISION
June 8, 2007

No. 1-04-2709

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| | ) | |
| | ) | No. 01 CR 22689 (03) |
| v. | ) | |
| | ) | |
| GLENN SIMS, | ) | Honorable |
| | ) | Lon William Schultz |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County defendant, Glenn Sims, was found guilty of first degree murder and armed robbery. Defendant was sentenced to consecutive terms of 28 years' and 9 years' imprisonment, respectively. On appeal, defendant contests the sufficiency of evidence to sustain his conviction for first degree murder. He specifically contends that the State failed to prove beyond a reasonable doubt that the stress caused by the armed robbery was a contributing cause of the victim's death, which occurred approximately 5½ hours after the robbery. Defendant also contends that the trial court erred in prohibiting the defense expert witness from referring to a hospital protocol to explain his conclusion that the victim died from respiratory arrest not related to any stress resulting from the robbery.

1

Defendant further contends that he was provided ineffective assistance of counsel because counsel (1) failed to appropriately raise the affirmative defense of compulsion and neglected to have the jury instructed as to this defense; and (2) failed to tender the hospital protocol to the State, thereby precluding the expert from fully testifying to an alternate theory of causation in the victim's death. Defendant finally contends that the trial court abused its discretion in sentencing him, because it did not adequately consider mitigating factors. For the reasons discussed below, we reverse and remand.

## I. BACKGROUND

Defendant was arrested and charged with one count of first degree murder arising from the commission of a forcible felony, armed robbery in violation of section 9-1(a)(3) of the Criminal Code of 1961 (720 ILCS 5/9-1(a)(3) (West 2000)) and two counts of armed robbery in violation of section 18-2 (720 ILCS 5/18-2 (West 2000)), one of Queen Smith, and the other of Guillermo Ramirez.

The evidence adduced at trial shows that on March 23, 2001, Noemi Ramirez, and her brother Guillermo Ramirez were working as cooks at Taurus Flavors restaurant at 8534 South Stony Island in Chicago, along with three other employees and Queen Smith, the night manager.

At trial, Noemi Ramirez testified on behalf of the State that about 9:30 p.m., two men wearing ski masks entered the restaurant. One of the men was carrying a gun and he jumped across the counter. Noemi testified that she and Guillermo lay face down on the floor as the man searched their pockets. Noemi then heard Smith come out of the bathroom, which was located in the back of the restaurant. According to Noemi, she heard a man order Smith to open the safe.

2

Shortly, afterwards, she heard two gunshots and then the men running through the rear door of the restaurant. After the police arrived, Noemi went to see Smith and observed Smith sitting in front of the bathroom door, unable to talk, breathing fast and "look[ing] scared."

Noemi also identified defendant in court and testified that he had worked at Taurus Flavors restaurant for a period of about three months, but that he was not an employee of the establishment at the time of the robbery. Noemi also testified that Smith was "a lady with a lot of energy" and a fast worker.

Guillermo Ramirez next testified to essentially the same sequence of events. He added that as he lay on the floor next to his sister, one of the masked men searched his pockets and took his wallet, which contained money. Guillermo further testified that after he heard the men run out of the store, he went to check on Smith and noticed that she looked very scared, "like she wanted to cry, but couldn't," and that she waved her hands as if she needed air. Guillermo also identified defendant in court as a former employee of the restaurant.

On cross-examination, Guillermo testified that after he came to help Smith, she spoke and asked him for a glass of water.

Larry Hardy next testified that he pleaded guilty to the murder and armed robbery of Smith and that he received a sentence of 25 years' imprisonment in exchange for his cooperation in the prosecution of defendant. Hardy stated that around 5 p.m. on March 23, 2007, he, defendant, Terrell Bell, Bernard Robinson, Megan Irwin, Carmella Hardy, and Ike Hardy were in his home discussing the Taurus Flavors restaurant, when Bell suggested that they rob it. Hardy further testified that because defendant had worked at the restaurant, he told everyone that the

restaurant made money, and that the safe was located in the bathroom, but indicated that defendant was "just telling us things that we [already] knew." Hardy next averred that Bell then left the house to get a gun from his own home. When he returned, they all discussed what everyone's role in the robbery would be. According to Hardy, defendant was to be the "lookout," stand in the front of the restaurant, and knock on the window to alert the others if the police arrived. Bell and Robinson were going to go inside the restaurant, and Hardy was to stand in the back and watch for police. All three would have their faces concealed. According to Hardy, it was also decided that Irwin, Bell's girlfriend, would drive them to the restaurant.

Hardy next testified that when Irwin drove the four of them to an alleyway a block away from the restaurant, defendant got out of the car first and walked toward the front of the restaurant. He came back and told the others that there were "some Latinos" and a "little black girl" inside the restaurant. At that point, Bell told everyone where to go, and he, Robinson and Hardy started walking toward Taurus Flavors, while defendant walked toward a gas station where he was to act as lookout. Hardy and Bell put on ski masks, and Robinson tied a scarf around his face. According to Hardy, Bell walked into the restaurant first, pointed the gun at the employees, told them to get on the floor and then jumped over the counter. Bell found Smith and pulled her to the bathroom, holding her by her shirt collar. Hardy testified that he remained in the front of the store, but that he could hear "a lot of commotion" in the bathroom. Soon afterward, Hardy heard two gunshots and some "tussling," as if someone was thrown against a wall. Hardy also heard Smith say that she did not know the safe combination, as well as cries of, "Don't hit me. Don't hit me again." After he heard Robinson yell that he found five bags of

4

money, Hardy proceeded to the back of the store, where he saw Smith next to the bathroom door.

He then ran out of the restaurant together with Bell and Robinson and went to Robinson's house.

Hardy testified that a short time later, they observed a police car from the window of Robinson's

house, grabbed some money, and ran each in his own direction. Hardy was apprehended by

police a short while later as he walked on Stony Island Avenue.

On cross-examination, Hardy testified that at the time of the robbery, he was 26 years old,

Bell was older than him, and Robinson was "around his age." He also testified that defendant

was only 15 years old. Hardy further testified that at the time of the robbery, defendant had run

away from home and was living in Hardy's house. Hardy also stated that on the afternoon of the

robbery, everyone in the house was drinking and smoking marijuana. Hardy testified that he was

a regular customer of Taurus Flavors restaurant and that he knew there was a safe in the

restaurant before defendant ever talked about it. According to Hardy, before everyone got into

Irwin's car, defendant stated that he did not want to take part in the robbery. According to

Hardy, defendant indicated that he "wasn't feeling it," and Hardy understood that to mean that

defendant was afraid. At this point, Bell who held the gun in his hand told defendant that "he

was there when it started, he got to be there when it finished," and everyone got into the car.

At this point the trial court called a recess, indicating to defense counsel that it seemed

that counsel was attempting to raise an affirmative defense of compulsion without having pled it

in the defense pleadings. The following colloquy then took place between defense counsel and

the court:

5

"MR. FOX[1]:  Judge, I believe I made a mistake by not filing or asking to file a compulsion defense this afternoon around 1:30 when I talked with *** Hardy and he told me something that he testified to now about how [defendant] wanted to get out of this robbery and one of the other guys said you couldn't get out of it.

He told me that today.  I have asked him previously.  He did not say that.  Other witnesses I have asked did not say.

THE COURT:  So you asked Mr. Hardy that on previous occasions and he did not give that information to you?

MR. FOX:  Correct.

THE COURT:  What other occasions have you spoken to Mr. Hardy?

MR. FOX:  None with Mr. Hardy, but I talked with *** Irwin on another court date.

THE COURT:  *** I am concerned with your lack of compliance and discovery rules and obligations that you have in representing the defendant.  And clearly when an affirmative defense is being raised as to the charges against him, you have an obligation to put the State on notice as to that.  Not to do so is a discovery violation and perhaps further violation of the cannons of ethics.

*** 

MR. FOX:  *** The reason I didn't file it today was because I was under

---

[1]Defense counsel.

the mistaken presumption that I couldn't argue it unless I could prove it. Whereas in speaking with another lawyers as long as it can be raised, that's enough to file it. I wasn't aware of the distinction.

THE COURT: That concept makes absolutely no legal sense to me whatsoever.

The statements that attorneys make in court regarding the evidence should be based on the evidence and reasonable inferences to be drawn from the evidence. That applies to affirmative defenses, whether there is direct evidence or a reasonable inference as to the affirmative defense based on the evidence that is in the record. ***

In my view, this is nothing but trial by ambush. I will allow you very reluctantly to pursue at least your questioning. I will deal with the issue of arguments and defense and instructions later."

After cross-examination resumed, Hardy testified that although defendant's role in the robbery was to knock on the restaurant window if the police showed up, he never heard a knock on the window and did not see defendant next to the window. According to Hardy, at the end of the robbery, no one went up front to check if defendant was there. Rather, Bell, Robinson, and Hardy all ran out through the back door.

On redirect examination, Hardy acknowledged that Bell never actually pointed the gun at defendant, or threatened to hit or hurt him, but stated that, "we all know what it mean[t]." Hardy further testified that he spoke to defense counsel prior to trial and gave him this information.

On recross-examination, Hardy testified that he had pleaded guilty to the armed robbery and murder in this case, and received 25 years' imprisonment for each to run concurrently, but that if he had not pleaded guilty and agreed to testify against his codefendants, he would have risked a sentence of up to 60 years' imprisonment.

Officer Steven Wiley next testified that on March 23, 2001, around 9:30 p.m. he was in his squad car when he received a call for a robbery in progress at Taurus Flavors restaurant. Officer Wiley immediately activated the emergency lights on his vehicle and proceeded to the restaurant. Upon his arrival, the officer noticed defendant on the pay phone about 30 to 40 feet away from the restaurant. Officer Wiley told another officer who had arrived at the same location to hold onto defendant while he went inside the restaurant to investigate. Once inside, Officer Wiley observed Smith hyperventilating and then saw the paramedics walk her slowly out of the restaurant.

On cross-examination, Officer Wiley testified that when he arrived at the scene and observed defendant next to the pay phone, defendant was not acting suspiciously.

Officer Nalls testified that around 9:30 p.m. on March 23, 2001, he was responding to a call for a robbery in progress at Taurus Flavors restaurant when he observed defendant near a pay phone next to the restaurant. Officer Nalls stated that he then heard Officer Wiley yell, "Grab that guy on the phone. He was here last time." The trial court sustained defense counsel's objection to this question and instructed the jury to disregard the officer's answer.[2] Officer Nalls

---

[2]At this point in the trial, defense counsel moved for a mistrial arguing that the State had violated a pretrial motion *in limine* precluding any reference to allegations that defendant had

testified that he next entered the restaurant and spoke to the victims. Once he was informed that the offenders had escaped on foot through the rear entry, the officer ran to the alley to pursue them and soon thereafter captured Hardy.

Officer Virginia McLinn next testified that about 9:30 p.m. on March 23, 2001, she was responding to a call for a robbery in progress at Taurus Flavors restaurant when she heard another announcement on her radio that the offenders were no longer at the scene of the crime. Officer McLinn testified that she was about six blocks away from the restaurant, near 84th Street and Stony Island, when she stopped her vehicle, waiting to see if any offenders would run in her direction. Officer McLinn stated that she then observed three black males, all dressed in dark clothing and carrying something in their hands, run out of the alley and into a basement stairwell of a house on 84th Place. Officer McLinn then drove her squad car very slowly into the alley next to the house where she observed the men on the stairwell, "totally engrossed in whatever they were looking at." Officer McLinn pulled her vehicle into the yard, got out and twice shouted, "Police Freeze." According to Officer McLinn, at that point two of the offenders ran westbound down the alley, one with something in his hands, and the third offender remained on the

_____

been involved in a prior robbery of the Taurus Flavors restaurant. The State argued that Officer Nalls did not violate the motion *in limine* because, in his testimony, he did not mention defendant's prior robbery, but merely stated that defendant was "there the last time." The trial court denied the motion for mistrial, noting that Officer Nalls' statement did not refer to a previous crime or "anything of that nature," and that defendant would not incur any prejudice as the jury was instructed to disregard that statement.

9

stairwell. When Officer McLinn approached him, he placed everything that he had in his hands on the protruding wall of the stairwell and also ran westbound. Officer McLinn testified that she went to see what the third offender had left behind and recovered a handgun, a live round of ammunition and a money bag. The officer immediately radioed for assistance and provided a description of the fleeing men as well as information about the direction of their flight. Officer McLinn then chased one of the men, who ran into Officers Nalls and Brumley. Officer McLinn later identified the three men as Hardy, Bell and Robinson

Officer Linda Davis next testified that about 9:30 on March 23, 2001, she was on duty near 87th Street and Stony Island Avenue when she received a call of a robbery in progress at Taurus Flavors restaurant. Officer Davis stated that as she headed toward the restaurant, she received a radio call from Officer McLinn indicating that some of the offenders were running westbound. Officer Davis was near 84th Street and Blackstone Place when she saw Bell run out of an alley and approach two females, who were later identified as Carmella Hardy and Irwin. Officer Davis took Bell, Carmella Hardy and Irwin into custody.

Officer Milton Hubbard, the evidence technician, next testified that about 11 p.m. on March 23, 2001, he arrived at the scene of the police investigation and examined Taurus Flavors restaurant. Among other things, Officer Milton testified that he found two 9-millimeter cartridge cases and one fired bullet in the bathroom of the restaurant. Officer Milton then went to 1536 84th Place and photographed the area by the back stairs leading to the basement, where Officer McLinn had observed Bell, Hardy and Robinson. There, Officer Milton found a 9-millimeter pistol and two bank money bags. At 1531 84th Place, he found a purse, and at 1525 E. 84th Place

10

he recovered some clothing, including gloves and a ski mask. At 1549 E. 84th Street, Officer Milton processed a Ford Taurus vehicle, from which he lifted two prints. Officer Milton testified that all the items were collected, inventoried and deposited into a locker at the crime lab.

Detective Michael Spaulding next testified that on March 23, 2001, as part of his investigation of the robbery at Taurus Flavors, he spoke to defendant at the police station. After learning that defendant was 15 years old, Detective Spaulding waited until a guardian was present before speaking to him. According to Detective Spaulding, Barbara Sims, defendant's grandmother, arrived at the police station at about 8 a.m. on March 24, 2001. Detective Spaulding testified that in the presence of Barbara Sims, he advised defendant of his Miranda rights and informed him that, even though he was 15, he would be tried as an adult. According to Detective Spaulding, defendant indicated that he understood, and the two proceeded to have a conversation in the presence of Barbara Sims.

Assistant State's Attorney Michael Crowe next testified that on March 24, 2001, he interviewed defendant in the presence of his grandmother, youth officer Kennedy and Detective Spaulding. Crowe testified that he first advised defendant of his Miranda rights and then had him sign a videotape consent form. According to Crowe, defendant's grandmother also had no objection to the videotaped statement. When Crowe asked defendant how he had been treated by various people at the police station, defendant told him that a light-skinned bald African-American police officer had hit him in the hat when he did not give the officer his father's telephone number quickly enough after the arrest, but that being hit had nothing to do with his present videotaped statement. According to Crowe, a videotaped statement was made about

11

10 p.m. on March 25, 2001.

On cross-examination, Crowe acknowledged that he never told defendant or his grandmother that he worked for the same office that would be prosecuting defendant if he were charged or that defendant could be charged and prosecuted with murder. Crowe also averred that after the interview was concluded he did not replay the video for defendant or ask defendant if he wanted to make any corrections or changes in that statement.

Defendant's videotaped confession was then published to the jury. In the videotape, defendant reiterated that he understood his Miranda rights and acknowledged that he signed the videotape consent form. Defendant then indicated that he was 15 years old. He stated that he was supposed to be living with his grandmother, but that he had run away and was living with his father, Glenn Sims, Senior, who lived with codefendant, Hardy. Defendant also stated that he worked at Taurus Flavors restaurant in the summer of 2000. According to defendant, about a week before the robbery, he visited the restaurant with Hardy's brother and one of the cashiers told them that the restaurant had made about $5,000 that day. Defendant discussed this information with Hardy, Bell, Robinson, Carmella Hardy, and Irwin, and they agreed to rob the establishment. Defendant stated that he told the others where the safe was located. He also stated that his role in the robbery was to stand by the pay phone next to the restaurant and to act as a look out.

Defendant also stated that on March 22, 2001, Hardy asked him to check to see how many people were working at the restaurant that day. The following day, at about 3 p.m., defendant purchased food at the restaurant and reported back to Hardy that there were six

12

employees inside Taurus Flavors. According to defendant, at about 8 p.m., he, Bell, Robinson, Hardy, Carmella Hardy and Irwin had another discussion about the robbery. Afterwards, around 9:15 p.m., Irwin drove Bell, Robinson, Hardy and him to the restaurant. At that time, Bell was carrying a 9-millimeter automatic gun, Hardy and Bell wore ski masks, and Robinson had tied a white scarf around his mouth. Defendant stated that he got out of the car first, walked to the pay phone adjacent to the restaurant and looked inside to see who was there. He then returned to the car and informed the others that there was no one in the restaurant, but that he knew Smith must be working, because her truck was parked in the front. According to defendant, Bell, Hardy and Robinson got out of the car, put on their masks, and walked into the restaurant. Defendant remained in front next to the pay phone. He stated that if the police showed up he was supposed to walk past the window and bang on it.

Defendant then watched Hardy, Bell and Robinson jump over the counter inside Taurus Flavors. He heard screaming and two gunshots. Soon afterward, the police arrived, placed defendant in the back of a police car and drove around looking for the others. Defendant stated that he was later taken to the police station, where an officer asked him for his father's phone number and "smacked him." Defendant stated that he was not injured as a result of this, although "his throat was hurting all the time." Defendant indicated that he was not hurting when he gave the videotaped statement and that the "smack" had nothing to do with his statement. Defendant also stated that his grandmother had been present for the entire duration of his questioning and that he had enough to drink and eat and was allowed to use the restroom.

Barbara Sims next testified that she was defendant's maternal grandmother and that she

adopted defendant about six years ago. She stated that her grandson had been treated well and was giving the statement voluntarily.

Dr. John Scott Denton next testified on behalf of the State that on March 24, 2001, as a deputy medical examiner for the Cook County medical examiner's office, he supervised a trainee, Dr. Rexene Worrell, in conducting an autopsy on the victim, Smith.[3] Dr. Denton testified that he did not perform the autopsy, but that he signed off on the autopsy protocol prepared by Dr. Worrell.[4]

Dr. Denton testified that the victim appeared to be the stated age of 53 years old and was overweight.[5] He stated that an external examination revealed a bruise to the bridge of her nose, a swelling of her left cheek bone, a bruise on her left knee and a fairly small abrasion on her right leg.

According to Dr. Denton, an internal examination showed that Smith's lungs were "markedly heavy," and filled with blood and fluid, which indicated a circulatory cardiac respiratory problem. Examination of Smith's heart revealed that the left anterior descending coronary artery was 90% blocked, her left circumflex coronary artery was 20% blocked and her

---

[3]The court qualified Dr. Denton as an expert in forensic pathology. The doctor was not, however, qualified as an expert in cardiology.

[4]The record reveals that the autopsy protocol included autopsy photographs, a postmortem examination report, a toxicologic analysis report, and diagrams made by Dr. Worrell while conducting the autopsy report.

[5]According to the medical report the victim was 5 feet 6 inches and weighed 250 pounds.

right coronary artery was fairly wide open. Dr. Denton testified that Smith suffered from coronary heart disease because her heart had yellow atherosclerotic plaque, which takes years to build up. According to Dr. Denton, Smith's heart was enlarged, weighed too much,[6] and had an overall flabby appearance. Dr. Denton stated that the autopsy report revealed that Smith's heart suffered from a chronic lack of oxygen causing it to dilate and collapse and expand from the normal "v" shape to a "u shape."

Examination of Smith's liver revealed that it was becoming "engorged with blood," which Dr. Denton testified indicated "poor circulation." Dr. Denton stated that the blood was backing up into the liver and the liver was expanding. Similarly, examination of Smith's brain revealed that it was swollen and weighed more than normal.

Dr. Denton further testified that when a person with or without coronary heart disease experiences stress, the body releases adrenalin and epinephrin, which causes the heart rate and blood pressure to increase, and forces the person to breath faster. Dr. Denton averred that for a person with Smith's level of coronary heart disease, a stressful event is an "insult to injury" and "can push someone over the edge very easily." He explained that in such circumstances, a heart like Smith's would dilate and stretch because it was already enlarged. Moreover, the 90% clogged artery would prevent the brain from getting enough oxygen and would ultimately cause the heart to experience fibrillation. According to Dr. Denton, the autopsy revealed that because

---

[6]According to Dr. Denton, Smith's heart was 509 grams, and "[a]nything over 500 grams is what we term electrically unstable heart. It's a heart that can stop. It can go into fibrillation or irregular heart beats."

Smith's heart was "u-shaped," the blood coming through the left ventricle was not getting "the forceful push" it needed to circulate the blood through her body and that as a result, blood and fluid backed up into the lungs and liver. According to Dr. Denton, however, it took several hours for Smith's lung and liver to begin filling with fluid.

Dr. Denton further testified that a person with 90% blockage of the main coronary artery can live for years without knowing that she suffers from coronary disease, until she suddenly experiences chest pains or even dies very suddenly. Dr. Denton stated that when a person with Smith's condition experiences stress, the stress can compress the heart and cause it to fail. According to Dr. Denton, it is difficult to quantify how much stress would cause a heart to fail, but that the stress Smith endured as part of the armed robbery was sufficient to cause her heart to fail and cause her death. As Dr. Denton stated, "the stress that brought [Smith] to the medical examiner's office was enough stress."

Dr. Denton also testified that "homicide by heart attack" is a term used by forensic pathologists to explain a situation where a person with severe heart or lung disease is subjected to stress, such as a burglary, or an altercation, and as a result of that stress dies within the "stress response of that time period." According to Dr. Denton the stress response time is variable and depends on the circumstances of each case.[7] Dr. Denton stated that it was his opinion that Smith

---

[7]Dr. Denton testified that the stress response could be anywhere between two "extremes," one involving stress immediately followed by a person grabbing his chest and collapsing, and the other involving "someone who suffers a stress and then *** [goes] into congestive heart failure, possibly over days, *** [having] to go to the ICU where [he or she is] on a ventilator and [where]

16

died within the stress response time because she died approximately 5 ½ hours after the robbery and was still being treated and evaluated at the hospital for stress symptoms related to that robbery. Dr. Denton averred that if Smith had been released from hospital and then died at home, he would not have concluded that she had died within the response time period.

Dr. Denton also testified that Smith was given Atavan at the hospital, which is a type of short-acting Valum drug that calms a patient down.

Dr. Denton finally concluded that within a reasonable degree of scientific and medical certainty it was his opinion that "[t]he cause of death in Queen Smith [was] coronary atherosclerosis of the heart or heart disease, and the contributing factor in her death [was] blunt trauma to the head due to an assault." Dr. Denton also indicated that it was his opinion that the manner of death was homicide.

On cross-examination, Dr. Denton acknowledged that Smith's other injuries were not life-threatening. He acknowledged that CPR can cause lungs to fill up with fluid, but indicated that he had never seen lungs that weighed 900 grams as a result of CPR. Dr. Denton also testified that Smith's blood pressure could have fluctuated after the armed robbery, and that he could state with a reasonable degree of medical certainty only that her blood pressure was high during the incident at the restaurant.

Dr. Denton also testified that it was standard protocol to order a patient's hospital records for an autopsy, but that he did not recall if he saw Smith's hospital records before signing the autopsy report. Dr. Denton stated that he did see "bits and pieces" of those records in a meeting

[he or she] can't be revived."

with the attorneys in preparation for codefendant Robinson's trial. Dr. Denton, however, testified that he found nothing in those records that would change his conclusions.

On redirect examination, Dr. Denton stated that, in his opinion, Smith did not die as a result of CPR. He also testified that the "bruises" on Smith's face, although not life threatening themselves, were the "contributing factor" that pushed her heart disease over the edge. Following Dr. Denton's testimony, the State rested its case.[8]

In his defense, defendant called Chicago fire department ambulance commander Dennis Bixter.[9] After Bixter testified that he could not recall the paramedic call that he received about 9:30 p.m. on March 23, 2001, he was permitted to review his "run sheet" for that call, indicating that he had filled out the report contemporaneous to the events described therein and that he recognized his signature on it. Afterwards, referring to the run sheet, Bixter testified that after receiving a call at 9:43 p.m., he and his partner, paramedic candidate Roberta Shanahan, went to a restaurant located on 85th Street and Stony Island Avenue. After arriving at the restaurant at exactly 9:48 p.m., inside Bixter observed Smith "hyperventilating," which he defined as "breathing too fast." Bixter explained that "hyperventilating" does not mean that Smith was

---

[8]The State also introduced testimony by a forensic scientist that the two fired cartridge casings found at the scene were fired from the 9-millimeter pistol also found after the incident. The parties also stipulated that a forensic scientist would testify that she received four latent prints from the Chicago police department but that only one was suitable for comparison and that print did not match those of Robinson, Hardy, Sims or Bell.

[9]At the time of the armed robbery, Bixter had worked as a paramedic for 21 years.

experiencing "shortness of breath," an "unscientific term that a lot of people use to describe what they perceive as breathing difficulty." Bixter also stated that he did not notice any signs of trauma to Smith's body, such as bruises, lacerations or fractures.

Bixter testified that at 9:52 p.m, his partner took Smith's vital signs and related them to him. Smith's blood pressure was 220 over 110, her heart rate was 108, and her respiration rate was 22 per minute, all of which were high. According to Bixter, Smith's skin color, moisture and temperature were all normal. Bixter testified that his partner checked Smith's lungs and indicated that they both "sounded clear." Bixter testified that the term "clear" lung indicated a smooth passage of air in and out of a lung, with no detectable pathology that would cause an unusual sound. As he explained: "[clear] essentially *** means *** she is breathing normally." According to Bixter, at 10:01 p.m, Smith's vitals were taken again. This time, her blood pressure was 188 over 88, which was "still high." Smith's heart rate was 100 and her respiration rate was 16, which was "still a little fast," but "not within the category of hyperventilation."

Bixter also stated that Smith did not need to be restrained while being transported to the hospital in the ambulance vehicle and that her care was transferred over to hospital staff at 10:09 p.m.

Defendant next called City of Chicago paramedic Roberta Shanahan, who testified that about 9:45 p.m., on March 23, 2001, along with her partner Dennis Bixter, she was dispatched to a restaurant on Sony Island, where "a lady, who would be our patient, *** was pacing [and] *** was very upset." Shanahan admitted that she only remembered "bits and pieces" of what happened and would have to refer to the "run report" for that day, which she signed but which

19

was prepared by Bixter. The court called a sidebar outside the presence of the jury and stated that Shanahan would not be allowed to read the report into the record. Shanahan explained that although her signature was on the report, the computer prints out the report at the beginning of the day before the first call, and she did not have any independent recollection of Smith's vital signs. The court indicated that the document would not constitute a business record or a past recollection recorded because Shanahan did not prepare it herself.

Back in front of the jury, Shanahan testified that Smith was ambulatory and that she walked to the emergency vehicle by herself. She also stated that during the ride to the hospital, Smith did not need to be restrained but was able to sit up by herself.

Defense counsel next called Dr. Joseph Messer. Based on the following information, the court qualified Dr. Messer as an expert in cardiology. Dr. Messer is a graduate of Harvard College and Harvard Medical School. At the time of the trial, he had been a practicing physician for 45 years. Dr. Messer had been chief of cardiology at the Boston City Hospital for 10 years until he came to Chicago to act as chief of cardiology at Rush Medical Center. In 1987, Dr. Messer retired from that position and entered private practice. Dr. Messer was one of 47 worldwide masters of the American College of Cardiology and the chairman of the Independent Practice Association, which consists of 25 cardiology groups in greater metropolitan Chicago that work together to try and improve the practice of cardiology. He has published around 40 articles, chapters in books and editorials on coronary artery disease and congestive heart failure.

Dr. Messer testified that he was asked by defense counsel to review Smith's records from the emergency medical service, paramedic records, supplementary records, hospital records and

the autopsy report and give his opinion as to the cause of Smith's death. He stated that based on his review of these records, he reached the opinion, to a reasonable degree of medical certainty, that stress did not play role in Smith's death and that she did not die from coronary atherosclerosis.

Dr. Messer testified that although the autopsy report indicated that one of Smith's three major coronary arteries was 90% obstructed, the other two arteries were sufficiently open and thus precluded coronary atherosclerosis from causing death. Dr. Messer stated that the state of Smith's heart indicated that she suffered from a severe narrowing of one coronary artery, but not severe heart disease, because the other two arteries were able to deliver sufficient blood supply to the heart muscle.

Dr. Messer further testified that the hospital records indicated that Smith arrived at the emergency room "hyperventilating," which indicated that she was "short of breath." According to Dr. Messer, there was nothing in the records indicating that Smith complained of chest pain, although the records show that she was questioned at least two or three times as to whether she was having any such pains. Dr. Messer also stated that according to the records, Smith's blood pressure, her respiratory rate, and her pulse at the time of arrival were only mildly elevated. Dr. Messer stated that someone with a preexisting condition of 90% blockage in one of the three major arteries would experience an increase in blood pressure due to an exciting event because the anxiety and stress of the situation would cause a release of adrenalin and an increase in blood pressure.

Dr. Messer further testified that of the factors he considered in formulating his opinion,

the most important was the "Code Blue Log," which outlined Smith's condition and the treatment attempted just prior to and at the time of her death by those caring for her after the arrest. As Dr. Messer began to disclose why the "Code Blue Log" was important, the State called a sidebar to review the documents Dr. Messer was relying upon for his opinion. It was revealed that a packet of hospital records including "all protocols for intravenous sedation of behavioral medicine patient in effect for the years 2001, 2, and 3" had never been tendered to the State in discovery. Apparently, that protocol revealed that the Atavan should be administered to patients intravenously and not orally. Defense counsel responded that the documents pertained to the hospital's protocols for administering sedation and did not contain any information specifically regarding Smith. Further, defense counsel indicated that he could not state with certainty that the documents had been tendered to the State. Defense counsel averred that even if the document Dr. Messer was relying on had not been tendered to the State, the State had been placed on notice of this protocol through Dr. Messer's report, which had been tendered to the State and which listed the items Dr. Messer had reviewed, including the hospital protocols.

The trial court then reviewed Supreme Court Rule 413(c) (134 Ill. 2d R. 413 (c)) and asked defense counsel why the State had not been tendered the documents that had been used by the defense expert, to which defense counsel replied that the assistant public defenders for all of the codefendants in this case were working together to get documents from the hospital, and that he obtained the records from one of the codefendant's attorneys and was under the misapprehension that the item had been tendered to the prosecution. Defense counsel further stated that he did not believe that Dr. Messer would testify that he relied on the hospital's

protocols in forming his opinion that Smith died of respiratory arrest, but rather that he relied

primarily on the paramedic report and the report from the hospital showing what happened there.

In response, the State cited to Dr. Messer's pre-court opinion, which stated:

> "I am unaware of any instance in which emotional stress has resulted in
>
> *respiratory arrest and believe that respiratory arrest may have resulted from*
>
> *Atavan administered intravenously rather than orally as written in the orders.*
>
> Contrary to the policies and procedures for administration of intravenous sedation
>
> the decedent did not have vital signs closely monitored and there is no record of
>
> oxygen saturation values recorded during the decedent's nearly five hours in the
>
> emergency room." (Emphasis added.)

Defense counsel argued that Dr. Messer did not have an opinion to a reasonable degree of

medical certainty as to what caused Smith's respiratory arrest, and that the basis of his opinion

was the "Code Blue" and not the protocols. The court replied that, "the rest of the sentence, at

least the way the State read it [from Dr. Messer's pretrial opinion], was given in apparently [*sic*]

contrary to some established protocol that might be reflected in these documents that weren't

tendered." Defense counsel then argued that he would not ask Dr. Messer to speculate as to what

might have caused the respiratory arrest, because he "doesn't know."

The trial court subsequently made the following ruling:

> "If [Dr. Messer is] going to come in here and render even partially that the
>
> cause of death resulted from hospital violating their own policies of giving an
>
> intravenous injection of some drug that should not have been given, I think that

23

it's unconscionable that the Sate wasn't put on notice at least in giving the- because first of all, the opinions are going beyond what [Dr. Messer] indicated he's going to be expressing opinions on in what I ordered to be prepared just to avoid all of this months ago and I've even now expanded that a little bit so as not to deprive [defendant] of his right to present his defense.

What I'm going to do, and I suppose if there is a conviction in this case it will be reviewed and I may be criticized, but this to me is an ongoing symptom of, I suppose in part even as to subtle issues, trial by ambush. And I'm not going to allow it. I indicated before I was not going to allow it.

I will allow the doctor to continue to testify. He can express his opinion as to what he believes based on his expertise and what he reviewed caused the death of Miss Smith.

There will be no reference to this report, and he will not render or state any opinion or be asked any opinion with regard to hospital protocols and ostensible hospital or doctor or nurse violations of hospital protocols.

***

Well, I'm not even preventing you [defense counsel] from bringing in that if [Dr. Messer's] experience and training and expertise and observations of the chart of this patient's are such that he believes somehow the Atavan played a role in that and he's established a sufficient familiarity with that drug, I'm not preventing you from bringing that out.

24

What I'm preventing you from bringing out is that somehow it's a grander conspiracy or negligence or something of a doctor or some medical person violating the hospital policy for which the State has not been given any notice or tendered any such documents in order to inquire into that. *And I'm certainly not going to recess this trial so that they can take whatever length of time it does to combat an alleged hospital negligence*." (Emphasis added.)

Following the trial court's ruling, defense counsel did not ask Dr. Messer any questions relating to the hospital protocol or negligent administration of Atavan. Instead, Dr. Messer continued his testimony by stating that Smith's respiration rate was 22 breaths per minute when taken by the paramedics and 36 breaths per minute when taken by triage at the hospital. According to Dr. Messer, the normal respiratory rate is anywhere between 12 to 22 or 23 breaths per minute. Dr. Messer further testified that respiratory rates are very much related to the amount of stress and emotional trauma that a person experiences, and that in this case, Smith's respiratory rates were "quite normal" when the paramedics arrived at the restaurant.

In addition, Dr. Messer testified that at 9:52 p.m. the paramedics took Smith's heart rate and noted that it was 108, and that later, at 10:01 p.m., it was 100. The hospital records further indicated that Smith's heart rate was 93 upon admission to the hospital. According to Dr. Messer, "the normal range of heart rate [is] between 60 and 100." Dr. Messer explained that if heart rates are only slightly elevated or normal, like in Smith's case, the heart is not under a greatly increased burden. Moreover, according to Dr. Messer, the fact that Smith's heart rates were only slightly increased and then came down into the normal range suggests that she was not

25

under great emotional stress when she arrived at the hospital.

Dr. Messer further explained that the "Code Blue Log" indicated that CPR was started on Smith at 2:25 a.m, and that the box for "respiratory arrest" was checked and not the box for "cardiac arrest." According to Dr. Messer, this indicated that those caring for Smith believed that she was suffering a respiratory arrest, which is the cessation of breathing, and not a cardiac arrest, which is a cessation of heart action. Dr. Messer testified that the log indicated that the respiratory arrest was "unwitnessed," indicating that "we really don't know how long this patient had arrested." The record indicates instead that at 2:35 a.m., 10 minutes later, Smith was intubated so that she could ventilate more effectively, and that at 2:40 a.m. she still had a pulse, or a beating heart. According to Dr. Messer, the "Code Blue Log" indicated that 18 minutes after those in attendance had indicated that Smith was in respiratory arrest, Smith had no more pulse, *i.e.,* that her heart had stopped beating. Dr. Messer testified that the "Code Blue Log" establishes that "this was a classic respiratory arrest followed by a cardiac arrest," and that in his entire career he has "never seen a patient die of a respiratory arrest from emotional distress."

Dr. Messer finally stated that Smith's enlarged heart was a reflection of her history of high blood pressure and that the fluid in her lungs was produced by CPR, which had been performed on her for 35 minutes.

On cross-examination, Dr. Messer acknowledged that stress could lead to a heart attack. Dr. Messer also stated that he never spoke with any of the doctors who wrote the hospital reports to determine their accuracy and did not know who wrote the "Code Blue Log." Dr. Messer further acknowledged that he never examined Smith, that he did not know what her normal heart

26

rate was, and that if her normal heart rate was 60, a rate of 100 would be "significantly higher than 60."

The jury found defendant guilty of armed robbery and of first degree murder during the commission of the forcible felony of armed robbery. After hearing arguments in aggravation and mitigation, the court sentenced defendant to 28 years' imprisonment for the first degree murder of Smith[10] and 9 years' imprisonment for the armed robbery of Guillermo Ramirez to run consecutively, for a total of 37 years' imprisonment. Defendant now appeals.

## II. ANALYSIS

### 1. Sufficiency of Evidence

Defendant first contends that the evidence presented at his trial was insufficient as a matter of law to sustain his conviction for the charge of first degree murder. We disagree.

At the outset, we reject defendant's contention that this issue presents a question of law, subject to *de novo* review. In support of this contention, defendant cites to People v. Smith, 191 Ill. 2d 408, 411 (2000), where our supreme court held that where facts of the case are not in dispute, defendant's guilt is a question of law, which should be reviewed *de novo*. Unlike in the present case, in Smith, the court was essentially asked to construe the meaning of a statute as it applied to the undisputed facts of that case. Moreover, unlike in Smith, here defendant is specifically asking this court to review the jury's findings of fact that defendant's conduct

---

[10] The charge of armed robbery of Queen Smith merged with the first degree murder under the one-act one-crime rule. See People v. Rodriguez, 169 Ill. 2d 183 (1996).

contributed to Smith's death, based on the conflicting testimony of the two medical experts. As such, the facts are in dispute and the standard of review is not *de novo*.

Rather, the applicable standard of review requires us to determine whether defendant's conviction was against the manifest weight of the evidence. People v. Ervin, 297 Ill. App. 3d 586, 590 (1998). Under this standard, when considering a challenge to the sufficiency of the evidence the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. People v. Hall, 194 Ill. 2d 305, 330 (2000). The weight to be given the testimony, the credibility of the witnesses, the resolution of conflicting testimony, and the reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact. People v. Walensky, 286 Ill. App. 3d 82, 97 (1996); People v. Milka, 211 Ill. 2d 150, 178 (2004). A reviewing court will not set aside a criminal conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify reasonable doubt of the defendant's guilt. Hall, 194 Ill. 2d at 330.

In this case, defendant was convicted of first degree murder arising from the commission of a forcible felony, armed robbery, in violation of section 9-1(a)(3) of the Criminal Code of 1961 (720 ILCS 5/9-1(a)(3) (West 2000)). Under the felony murder statute, a person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death, he is attempting to or committing a forcible felony, other than second degree murder. See 720 ILCS 5/9-1(a)(3) (West 2000).

We initially note that there is no issue raised as to whether defendant committed the forcible felony of armed robbery. Defendant does not contest the applicability of the legal theory

of his accountability for the actions of Robinson, Bell and Hardy in perpetrating the felony of armed robbery which is alleged to have resulted in Smith's death.  Instead, on appeal, defendant solely asserts that the State failed to establish that the forcible felony was the contributing cause of Smith's death.  Defendant specifically contends that the State failed to prove beyond a reasonable doubt that the stress caused by the armed robbery was a contributing cause of Smith's death, which occurred 5 ½ hours later.

To prove defendant guilty of murder, the State was required to prove beyond a reasonable doubt both the fact of death and the criminal agency causing death.  People v. Fuller, 141 Ill. App. 3d 737, 748 (1986).  Illinois law follows the proximate cause theory of liability for felony murder.  People v. Dekens, 182 Ill. 2d 247, 249 (1998).  The focus of the proximate cause theory of liability is whether the defendant's actions "set in motion a chain of events [which were or should have been within defendant's contemplation] that ultimately caused the death of the decedent." People v. Lowery, 178 Ill. 2d 462, 473 (1997).  The State need not prove that defendant's acts constituted the sole and immediate cause of death (People v. Martin, 112 Ill. App. 3d 486, 499 (1983)), but rather must show that defendant's acts were a contributing cause of death, such that death did not result from a source unconnected with or independent of those acts (see Fuller, 141 Ill. App. 3d at 748; see also Dekens, 182 Ill. 2d at 249 (a defendant's criminal acts are the proximate cause of a person's death if they contribute to that person's death, and the death is not caused by an intervening event unrelated to the defendants acts); People v. Paulson, 80 Ill. App. 2d 44 (1967) (noting that an intervening cause, completely unrelated to the acts of defendant, relieves a defendant of criminal liability); People v. Hudson, 222 Ill. 2d 392,

29

401 (2006), quoting 1 W. LaFave, Substantive Criminal Law §6.4, at 464 (2d ed. 2003) ("Foreseeability is added to the cause-in-fact requirement [of proximate cause] because 'even when cause in fact is established, it must be determined that any variation between the result intended *** and the result actually achieved *is not so extraordinary that it would be unfair to hold the defendant responsible for the actual result.*' [Citation.]"(Emphasis added.)).

Defendant first contends that the jury was presented with conflicting medical opinions as to the cause of Smith's death and asks us to reweigh the experts' testimonies based on their respective qualifications. Defendant does not directly challenge Dr. Denton's qualifications as a Cook County medical examiner and pathologist to testify as to the cause of Smith's death (see People v. Jackson, 145 Ill. App. 3d 626, 633 (1986) (noting that generally expert witnesses are qualified if, because of their skill, training or experience, they are better able to form an accurate opinion concerning the matter at issue than is an average layperson)), but rather contends that the testimony of Dr. Messer, the defense expert, should have been given more weight because, unlike Dr. Denton, Dr. Messer is a world-renowned cardiologist and thus far better qualified.

At the outset, we note that the issue here is not who among the two experts was better qualified to offer an opinion but rather whether Dr. Denton's opinion, as challenged by Dr. Messer's conclusions, was *sufficient* for the jury to find defendant guilty. The cause of death is a question of fact, which should be left to the trier of fact (see People v. Brackett, 117 Ill. 2d 170, 177 (1987); Fuller, 141 Ill. App. 3d at 748). It is for the trier of fact to evaluate the expert testimonies and weigh their relative worth in context. Fuller, 141 Ill. App. 3d at 748. When the expert testimonies offer divergent conclusions, the jury "is entitled to believe one expert over the

other" (Hall v. National Freight, Inc., 264 Ill. App. 3d 412, 423 (1994)) and is not required to search out a cause of death compatible with innocence (Fuller, 141 Ill. App. 3d at 748).

In the present case, Dr. Messer testified that Smith died as a result of respiratory arrest, which was not related to stress arising from the armed robbery. His testimony directly conflicted with Dr. Denton's conclusion that Smith died of a heart attack, arising from stress that she suffered during the armed robbery. The jury, hearing both testimonies, resolved the credibility question in favor of the State's witness, which was well within its discretion to do. See Hall, 264 Ill. App. 3d at 422-23 ("[t]he testimony of expert witnesses is to be considered in light of their qualifications, the quality of their testimony, and their credibility," and the trier of fact is generally "in a better position to review pertinent exhibits and assess witness credibility").

As such, we must turn to the threshold inquiry of the sufficiency of Dr. Denton's testimony in establishing the cause of death. Defendant contends that Dr. Denton's testimony was insufficient to establish a cause of death because unlike Dr. Messer, Dr. Denton did not consider the essential "Code Blue Log" reporting Smith's state of health and her treatment at the hospital immediately prior to her death, but based his opinion entirely on Smith's autopsy report. We disagree.

We first note that it is unclear from the record whether Dr. Denton had an opportunity to examine the "Code Blue Log" before formulating an opinion as to Smith's death. The record does not specifically show that Dr. Denton considered the "Code Blue Log" in coming to his opinion, but also does not rule out the possibility that he did not see the document before trial. According to the trial transcript, Dr. Denton testified that he could not recall if he had seen the

31

Jackson Park hospital records before signing Dr. Worrell's autopsy report. Dr. Denton, however, stated that he did see Smith's medical records in an informal conference with the public defenders, including defense counsel, before codefendant Robinson's trial in 2004. Dr. Denton indicated that during that meeting, he saw only "bits and pieces" and "some parts" of Smith's medical records. When questioned if he read those records, Dr. Denton stated that he "looked at them" but "didn't keep them and retain them and study them." Dr. Denton, however, also testified that after seeing those records, he "reevaluated his opinion" but found nothing in them that would change his conclusions.

We next note that experts, otherwise qualified, are generally permitted to state their opinions if the information upon which they are basing their opinions is the type reasonably relied upon by the experts in their field (see People v. Hernandez, 313 Ill. App. 3d 780, 784 (2000); Wilson v. Clark, 84 Ill. 2d 186, 193-94 (1981)), and expert testimony can be introduced only upon a proper foundation of facts already in evidence (see People v. Moore, 199 Ill. App. 3d 747, 772 (1990)). In the present case, in forming his opinion, Dr. Denton relied on the autopsy protocol prepared by Dr. Worrell, which included a postmortem examination, a toxicologic analysis report, and diagrams made by Dr. Worrell in performing the autopsy. Generally, these types of reports are reasonably relied upon by experts in the field of forensic pathology to form their opinions as to the cause and manner of death (see People v. Nieves, 193 Ill. 2d 513, 528 (2000) (held that in reviewing autopsy photographs, postmortem examination report, toxicology report, evidence receipt, diagrams prepared during autopsy, and investigator's report, chief examiner relied upon type of evidence reasonably relied on by experts in the field of forensic

32

pathology to form their opinions as to the cause and manner of the victim's death)).

Furthermore, Dr. Denton's testimony posited a plausible causal connection between the armed robbery and Smith's death 5 ½ hours after that robbery. Dr. Denton opined that Smith died as a result of a heart attack, which was induced by the stress she suffered during the armed robbery. Dr. Denton testified that Smith was an elderly, severely overweight woman, who suffered from severe heart atherosclerosis. Dr. Denton explained that the atherosclerosis was evident from Smith's autopsy which revealed that Smith's heart had yellow atherosclerotic plaque, that her main left coronary artery was 90% blocked, and that her heart was abnormally flabby and "u"-shaped (*i.e,.* was experiencing "chronic lack of oxygen"). Dr. Denton further testified that because Smith's heart weighed over 500 grams, it was "electrically unstable," *i.e.,* it could stop or go into fibrillation, or irregular heart beats, at any time.

Dr. Denton stated that for a person with Smith's heart condition, a stressful event in the nature of a scare would be an "insult to injury" which could push the person "over the edge," causing her heart to compress, fail and go into cardiac arrest. Under such stress, an enlarged heart such as Smith's would have to dilate and stretch as it would have to work harder to pump the blood through the body. However, because the heart's main artery is 90% clogged, the brain would be prevented from receiving enough oxygen and the heart would experience fibrillation.

Dr. Denton averred that Smith's autopsy revealed lungs that were "markedly heavy," and filled with blood and fluid, and a liver that was becoming "engorged with blood." According to Dr. Denton, this indicated that Smith's "u"-shaped heart could not make a forceful enough push to circulate the blood through the entire body, and as a result, within a few hours, blood and fluid

backed up into her lungs. Dr. Denton also rebutted Dr. Messer's testimony that Smith's lungs filled up with blood because CPR was performed on her for about 35 minutes, by explaining that although CPR can cause lungs to fill up with fluid, he had never seen lungs that weighed 900 grams as a result of CPR.

Dr. Denton finally stated that Smith died as a result of a "homicide by heart attack," which he defined as occurring when someone with severe heart or lung disease is subjected to intense stress and dies within the stress response time. Dr. Denton concluded that Smith died within the stress response time because she was being treated at the hospital for the stress symptoms she experienced during the armed robbery and had not been released by any hospital personnel before going into cardiac arrest.

Viewing this evidence in the light most favorable to the prosecution, we hold that Dr. Denton's testimony was sufficient to establish that the stress caused by the armed robbery was a contributing factor in Smith's death. See Fuller, 141 Ill. App. 3d at 748-49 (court held that evidence was sufficient to sustain finding that the victim's death of a heart attack was caused by injuries he received during the commission of a felony, 27 days earlier, even though the experts' testimonies on the cause of death directly conflicted, because defense expert's opinion was principally based upon speculation that the pathologist's report was inaccurate and his autopsy techniques insufficient; court also made note of defense expert's opinion that the victim died of complications in surgery that resulted from pulmonary embolization related to gallbladder disease, rather than from a heart attack, but indicated that "[a] reasonable doubt does not exist because other factors may have contributed to decedent's death[,] or because an individual

34

without decedent's medical history might not have died from the trauma"); Brackett, 117 Ill. 2d at 178-79 (court held that the trier of fact was entitled to find that defendant, a 21-year-old male who battered and raped an 85-year-old woman, set in motion a chain of events that contributed to her death, five weeks later, of asphyxiation, while being fed by a nurse's aide in a nursing home, noting that "defendant takes the victim as he finds [her]," and that "[the jury placed] great weight" on the testimony of the State's expert, who concluded that, as a result of the attack, the victim, who had been a "feisty woman," became depressed and resisted efforts to feed her).

In coming to this conclusion, we have considered People v. Kent, 111 Ill. App. 3d 733 (1982), cited by defendant and find it inapposite. In that case, defendant was charged and convicted of first degree murder based on the evidence that she admitted feeding beer to her baby twice daily from the time the baby was three weeks old until it died at the age of four months. Kent, 111 Ill. App. 3d at 739. At trial, the State's pathologist testified that in conducting post-mortem tests, he requested an alcohol determination on the muscle tissue he removed from the neck of the deceased, which revealed 20 milligrams % ethanol in the tissue, but that he did not preserve any blood from the infant's body because he did not initially consider alcohol poisoning to be a possible cause of death. Kent, 111 Ill. App. 3d at 735. The pathologist agreed with the testimony of defense experts that Sudden Infant Death Syndrome, Reyes Syndrome, and malnutrition could have caused the physical conditions found in the infant during the autopsy. Kent, 111 Ill. App. 3d at 736. In Kent, the court reversed defendant's conviction, concluding that the totality of evidence presented at trial was insufficient to prove beyond a reasonable doubt that defendant's acts were the cause of the baby's death. Kent, 111 Ill. App. 3d at 738. In doing so,

the court noted that the cause of death was "mere conjecture" because, among other things: (1) the proper medical tests were not performed to exclude the possibility that the alcohol content found in the baby's muscle tissue could not have originated from another medical condition or from an innocent source; (2) the amount of alcohol fed to the child was not established; (3) the small amount of alcohol found in the child's muscle tissue was consistent with normal bodily decomposition; and (4) too few tissue samples were taken to preclude error or contamination. Kent, 111 Ill. App. 3d at 738-39.

Unlike in Kent, in the present case, Dr. Denton's testimony regarding Smith's death, was not "mere conjecture." As noted above, Dr. Denton provided a basis for his conclusion that Smith died of a heart attack induced by the stress she suffered during the armed robbery. Dr. Denton testified that the autopsy report conclusively showed that the victim suffered from a severely clogged artery and that a person in such a condition, if exposed to stress, would likely suffer a heart attack. Moreover, unlike in Kent, where the court concluded that the pathologist's finding was based on an inadequate and unreliable autopsy, in this case, there was no evidence presented that questioned the accuracy of the autopsy report. In addition, unlike in Kent, here, Dr. Messer, the defense expert, provided no evidence to explain or offer an alternative and/or independent source of Smith's death. As shall be more fully discussed with regard to the the issue of the trial court's exclusion of certain hospital records, Dr. Messer only testified that Smith died of respiratory arrest, but offered no explanation as to what could have caused such an arrest, only 5 ½ hours after Smith had been robbed at gunpoint.

Defendant nevertheless contends that Dr. Denton's testimony is insufficient standing

36

alone as in a separate proceeding codefendant Robinson was acquitted for felony murder under a far less compelling set of circumstances.[11] See People v. Robinson, No. 1-04-2061 (March 20, 2006) (unpublished order pursuant to Supreme Court Rule 23). In codefendant's proceeding, the only evidence offered regarding the cause of Smith's death was that of the State witness, Dr. Denton. The jury in that case, however, found Dr. Denton's testimony an insufficient basis upon which to connect the stress caused by the armed robbery to Smith's death and acquitted Robinson on the charge of felony murder.[12]

Defendant does not contend that because codefendant was acquitted, he should also be acquitted, but rather argues that codefendant's acquittal indicates that "reasonable juries" could disagree as to whether Dr. Denton's testimony sufficiently established the cause of Smith's death. We note, however, that the fact that "reasonable juries" can disagree is irrelevant to our determination of sufficiency. See People v. Gharst, 122 Ill. App. 3d 1, 5 (1984) (noting that where codefendants are tried separately before different triers of fact, the acquittal of one codefendant has no bearing on the guilt of a codefendant, regardless of the nature of the evidence, because the attitudes of each trier of fact may differ, resulting in conflicting resolutions of factual disputes and credibility determinations); People v. Wehmeyer, 155 Ill. App. 3d 931, 944 (1987) ("Each trier of fact weighs the evidence, assesses the credibility of the witnesses, and applies the pertinent law on the basis of its preconceived attitudes and experiences. Provided the

_____

[11]As noted above, Robinson was one of the men who actually entered Taurus Flavors restaurant and demanded that Smith give him the combination of the safe.

[12]They jury found codefendant Robinson guilty of armed robbery.

trier of facts' determination is reasonable and supported by the evidence, we see no reason why the determinations of separate triers of fact *** require absolute consistency. In this regard, one trier of fact may be more lenient than another and enter a conviction for a lesser offense or only on one offense instead of two despite support in the evidence for both convictions").

2. Exclusion of Hospital Protocol

Defendant next contends that it was reversible error for the trial court to prohibit Dr. Messer from referring to the hospital protocols to further explain his conclusion that Smith died from respiratory arrest not related to any stress resulting from the armed robbery.

The State first contends that defendant has waived this issue for purposes of appeal because after the trial court indicated that it would not allow Dr. Messer to refer to the hospital's protocols, instead of objecting, defense counsel stated, "I have no problem doing that. I will certainly caution him not to mention it in any way." Defendant concedes that he failed to properly preserve this issue for appeal because he failed to object to it at trial, but contends that it was ineffective assistance for counsel not to do so. In the alternative, defendant asks this court to review his claim under the first prong of the plain error doctrine. 134 Ill. 2d R. 615(a); People v. Herron, 215 Ill. 2d 167, 186-87 (2005).

"[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error where either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." Herron, 215 Ill. 2d at 186-87. In the first instance, defendant must prove "prejudicial error," *i.e.,*

that there was error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. Herron, 215 Ill. 2d at 187. Under the second prong of the plain error analysis, defendant must prove there was error and that the error was so serious that it affected the fairness of his trial and challenged the integrity of the judicial process. Herron, 215 Ill. 2d at 187. In both instances, the burden of persuasion remains on the defendant. Herron, 215 Ill. 2d at 187, citing People v. Hopp, 209 Ill. 2d 1, 12 (2004).

For purposes of plain error, we first consider whether the trial court's decision to exclude the evidence was made in error. At the outset, we note that the record below is confusing and tenuous. First, it is unclear from the record whether defendant wanted the hospital protocol admitted in the first place. The transcript reveals that when defense counsel first attempted to elicit testimony from Dr. Messer regarding the "Code Blue Log," which outlined Smith's condition and treatment just prior to and at the time of her death by those caring for her after her arrest, the State called a sidebar (hereinafter referred to as "sanctions sidebar") to review the documents Dr. Messer was relying upon. During the sidebar, it was revealed that among other things, Dr. Messer was relying upon a 50-page document of "all protocols from intravenous sedation of behavioral medicine patient in effect for the years 2001, 2, and 3" from Jackson Park Hospital, which had not been tendered to the State in discovery.

When questioned by the court on this point, defense counsel changed course several times. First, counsel responded that the documents pertained to the hospital's protocols for administering sedation and did not contain any information regarding Smith or her treatment. Defense counsel next indicated that he could not state with certainty that the documents had been

tendered to the State, but indicated that the State had been put on notice of the protocol because Dr. Messer "put within his cover letter *** which was provided to the State on February 26, 2004, all the items he had reviewed, including the post-mortem, the Jackson Park records, protocols for sedation, the paramedics, the video tape, the police reports."

Defense counsel then changed course and admitted that the assistant public defenders for all of the codefendants in this case were working together to get documents from the hospital. Defense counsel explained that he had obtained the records from one of the codefendant's attorneys and that he had been acting under the misapprehension that the item had been tendered to the prosecution.

Counsel then changed course again, however, and surprisingly stated that he did not intend to ask Dr. Messer to base his opinion on the sedation protocol. In response to this contention, the State cited to Dr. Messer's precourt opinion and indicated that this document showed that in coming to his conclusion Dr. Messer relied on the hospital's sedation protocol and that, therefore, defense counsel clearly intended to elicit this information at trial. Dr. Messer's precourt opinion stated:

> "I am unaware of any instance in which emotional stress has resulted in *respiratory arrest and believe that respiratory arrest may have resulted from Atavan administered intravenously rather than orally as written in the orders.* Contrary to the policies and procedures for administration of intravenous sedation the decedent did not have vital signs closely monitored and there is no record of oxygen saturation values recorded during the decedent's nearly five hours in the

emergency room." (Emphasis added.)

The trial court agreed with the State and indicated that, "the rest of the sentence, at least the way the State read it [from Dr. Messer's pretrial opinion], was given in apparently contrary to some established protocol that might be reflected in these documents that weren't tendered."

In response, defense reiterated that Dr. Messer's opinion was based on the "Code Blue Log" and not on the hospital protocol, and indicated that Dr. Messer would only testify that Smith died of respiratory arrest but that he had no opinion to a reasonable degree of medical certainty as to what caused this respiratory arrest. Defense counsel assured the court that he would not ask Dr. Messer to speculate as to what might have caused the respiratory arrest, because the doctor "doesn't know."

We next note that although following this colloquy, the trial court sanctioned defense counsel by excluding evidence, it is unclear from the record what evidence the trial court actually excluded. After a careful review of the transcript, we cannot be sure whether the court intended simply to limit admissibility of the hospital protocol alone, to constrain any reliance by Dr. Messer on the hospital protocol in testifying about hospital negligence, or to entirely exclude any negligence testimony be it related to the sedation protocol or not. In making its ruling, the trial court stated:

> "If [Dr. Messer] is going to come in here and render even partially that the
>
> cause of death resulted from hospital violating their own policies of giving an
>
> intravenous injection of some drug that should not have been given, I think that

it's unconscionable*** because *** the opinions are going beyond what he's indicated he's going to be expressing opinions on in what I ordered to be prepared just to avoid all this months ago ***.

*** 

I will allow the doctor to continue to testify. He can express his opinion as to what he believes based on his expertise and what he reviewed caused the death of Miss Smith.

There will be no reference to this report, and he will not render or state any opinion or be asked any opinion with regard to hospital protocols and ostensible hospital or doctor or nurse violations of hospital protocols.

*** 

Well, I'm not even preventing you [defense counsel] from bringing in that if [Dr. Messer's] experience and training and expertise and observations of the chart of this patient's are such that he believes somehow that Atavan played a role in that and he's established a sufficient familiarity with that drug, I'm not preventing from you bringing that out.

What I am preventing you from bringing out is that somehow it's a grander conspiracy or negligence or something of a doctor or some medical person violating the hospital policy for which the State has not been given any notice or tendered any such documents in order to inquire into that. *And I'm*

42

*certainly not going to recess this trial so that they can take whatever length of time it does to combat an alleged hospital negligence.*" (Emphasis added.)

In making this ruling, the trial court acknowledged that this was a harsh sanction, noting that "if there is a conviction in this case it will be reviewed and I may be criticized," but nevertheless defined defense counsel's failure to timely furnish the State with a copy of the hospital protocol as "trial by ambush."

Because of the lack of clarity in this record, we cannot find that the trial court's ruling was too broad since we cannot state with any certainty that counsel intended to offer any testimony to establish negligence on part of the hospital, whether based upon the excluded protocol or based upon general medical standards otherwise known to the expert. We also note that defense counsel made no attempt to clarify this point or test the boundaries of the trial court's ruling, but instead acquiesced in the ruling and, following the sidebar, never asked Dr. Messer any question regarding Atavan, negligence, the hospital protocol or intravenous sedation.

However, if we were to find that in fact defendant intended to establish that the cause of death was induced by the intravenous administration of Atavan, we would be compelled to conclude that the exclusion of either the hospital protocol alone, or any general reference to negligence, would have been too harsh a sanction and therefore made in error. In Illinois, discovery rules are set in place in order to "prevent surprise or unfair advantage [to either party] and to aid in the search for the truth." People v. Daniels, 75 Ill. App. 3d 35, 41 (1979). Pursuant to Supreme Court Rule 413(c), defendant must furnish the State with a list of witnesses it intends to call, and with the statements and qualifications of expert witnesses, and allow the State to

inspect "any reports or results, or testimony relative thereto," which it has in its control or possession. 134 Ill. 2d R. 413(c).[13] When a party fails to comply with an applicable discovery rule, the circuit court is authorized to "order such party to permit the discovery of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such *** order as it deems just under the circumstances." 134 Ill. 2d R. 415(g). It is within the trial court's discretion to determine which sanction is appropriate, and its judgment is given great weight. People v. Levin, 207 Ill. App. 3d 923, 933 (1991).

However, sanctions are intended to accomplish the purpose of discovery, not to punish the offending party, and their imposition must not encroach on a party's right to a fair trial. See People v. Houser, 305 Ill. App. 3d 384, 393 (1999) ("The objectives of the discovery rules are accomplished by compliance, not by the exclusion of material evidence. *** If sanctions other than exclusion can sufficiently correct and deter discovery violations, then there is no reason to resort to a sanction that 'itself constitutes a "conscious mandatory distortion of the fact-finding process whenever applied."'[Citations.]"); People v. Damico, 309 Ill. App. 3d 203, 212 (1999) (sanctions should be "fashioned to meet the circumstances of the particular case with the ultimate objective of compelling compliance, not punishing a party for the oversight or the errors of his attorney"); People v. Anderson, 80 Ill. App. 3d 1018 (1980) (same); People v. Foster, 271 Ill. App. 3d 562, 567 (1995) (even when a discovery violation is wilful, and the State makes no showing of surprise or prejudice, the better option is to punish the offending attorney directly and

---

[13] Defendant is also under a continuing duty to disclose any additional information that he discovers after his initial compliance with discovery. See 134 Ill. 2d R. 415(b).

personally, not to impose sanctions on his client).

In the present case, if the record permitted us to find that the trial court intended to bar Dr. Messer from offering testimony as to general medical principles regarding the proper versus the negligent administration of Atavan, without seeking support from the Jackson Park Hospital protocol, we would conclude that such a ruling would clearly have been excessive because the discovery violation was made only with regard to counsel's failure to tender the hospital protocol. In any event, such a sanction would have been unduly harsh if a lesser sanction could have been imposed so as not to prevent defendant from fully asserting his sole theory of defense, namely, that Smith's death resulted from an intervening cause completely unrelated to the acts of defendant (*i.e.* his involvement in the armed robbery). See People v. Brooks, 277 Ill. App. 3d 392, 398 (1996), quoting People v. Osborne, 114 Ill. App. 3d 433, 437 (1983) (court reversed defendant's conviction finding that the trial court erred when it barred defendant's alibi witness on grounds that defendant violated discovery rules by making a typographical error in the address of that alibi witness; court noted that "'[i]t is a fundamental right of a defendant to present his theory of the case,'" and that the State failed to show how it was prejudiced by defendant's minor infraction of the rules); Foster, 271 Ill. App. 3d 562, 565-69 (1995) (court held that circuit court abused its discretion when it failed to consider alternative sanctions for an attorney's wilful violation of discovery rules, and barred defendant from raising an affirmative defense of self-defense because he failed to file a discovery response disclosing this intention; court noted that barring a defense is a sanction that infringes upon the rights of the defendant and should only be imposed as a last resort).

Morever, even to the use of the protocol itself, the court's ruling would have gone beyond the limits of its discretion, particularly since the hospital protocol would have substantially bolstered any opinion as to the hospital's negligence based on general medical principles by demonstrating the hospital's own implied recognition of that fact. In that regard, we first note that the State was not without notice as to what Dr. Messer would testify at trial. As the State itself pointed out, and the trial court agreed, Dr. Messer's written pretrial statement, tendered to the State on February 26, 2004, about three months prior to trial, indicated that the doctor would testify as to a possible connection between the intravenous administration of Atavan and Smith's subsequent respiratory arrest. As such, the State could have reasonably anticipated that defense counsel would question Dr. Messer about the potential link between Atavan and Smith's respiratory arrest and allude to negligence on part of the hospital in acting "contrary to [its] policies and procedures for administration of intravenous sedation."

Moreover, the record indicates that defense counsel was, at worst, negligent in failing to provide the State with the hospital protocol because in obtaining and tendering all the pretrial documents, she relied on her colleagues in the public defender's office who were working on codefendants' cases and subpoenaed Jackson Park Hospital for those records. As such, it would appear to be excessive to totally bar the introduction of the protocol when lesser sanctions are available, even if the ban would not have precluded the expert from testifying to negligence based on general medical principles. See Damico, 309 Ill. App. 3d at 212 (sanctions should not "punish [] a party for the oversight or the errors of his attorney"); People v. Foster, 145 Ill. App. 3d 477, 481 (1986) ("a defendant should not be penalized for his counsel's negligence"). Here,

46

too, a less severe sanction, such as a recess or continuance, would have been able to cure any prejudice or surprise to the State, as it would have allowed the State to review the hospital protocol, prepare for a more thorough cross-examination, or find a rebuttal expert witness. See People v. Hawkins, 235 Ill. App. 3d 39, 41 (1992) (noting that the sanction of excluding testimony is disfavored because it does not contribute to the goal of truth-seeking and that "[t]he preferred sanction is a recess or continuance if the granting thereof would be effective to protect the [party] from surprise or prejudice"); see also People v. Nelson, 92 Ill. App. 3d 35, 45 (1980) (noting that exclusion is a last resort, demanded only where a recess or a continuance would be ineffective); People v. Levin, 207 Ill. App. 3d 923, 933 (1991) (noting that the sanction of precluding evidence is limited to "only the most extreme cases of discovery violations"); People v. White, 257 Ill. App. 3d 405, 414 (1993) (noting that when exclusion of evidence is employed by the trial court, that sanction will be "closely scrutinized on appeal").

However, even if we could hold that the trial court abused its discretion by excluding either the hospital protocol or any reference to negligence, under the present record, we would have difficulty in finding that defendant was prejudiced by the court's ruling. See Herron, 215 Ill. 2d at 187 (to permit our review of unpreserved error, under the first prong of the plain error doctrine, asserted by defendant, defendant must show "prejudicial error," *i.e.*, that there was error, and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him).

Preliminarily, we note that aside from the question of whether defendant participated in the underlying felony, which will be discussed later with regard to the issue of compulsion, there

is no question that the evidence in this case was close. This is particularly true given that, in comparing the testimony of the two experts, the State's pathologist, Dr. Denton testified that he based his opinion on an autopsy performed by Dr. Worrell, whose report he only recalled reading, while he was uncertain if he ever saw the "Code Blue Log," which was key to the determination of the precipitating cause of death (namely, if it was cardiac or respiratory arrest), and given too the fact that Dr. Denton's opinion was rejected by a different jury in codefendant's case even in the absence of a medical expert offered by that codefendant. However, we find that under the present record, defendant cannot demonstrate that any testimony about hospital negligence or the use of the hospital protocol would have been outcome determinative in the face of his own counsel's surprising but apparent representation that he had no intention of offering it, and in light of the fact that after the court's ruling, he made no effort to do so.

As set forth above, the colloquy during the sanctions sidebar indicates that although the State and the trial court apparently viewed Dr. Messer's pretrial report as an indication that he would testify that the administration of Atavan somehow played a role in causing Smith's respiratory arrest, defense counsel disagreed. After the trial court's admonishments, defense counsel surprisingly disassociated himself from this theory, explaining to the court that he had no intention of asking Dr. Messer either about the "cause of the respiratory arrest" or the sedation protocol. Notwithstanding Dr. Messer's apparent clear pretrial statement to the contrary, defense counsel told the court that Dr. Messer did not have an opinion as to a reasonable degree of medical certainty as to what caused Smith's respiratory arrest, and that he would not ask Dr.

Messer to "speculate" on this point because the doctor "did not know."[14]  Counsel further

indicated that Dr. Messer had not relied on the sedation protocol in forming his opinion, but that

he had concluded that Smith died from respiratory arrest merely by considering the "Code Blue

Log."  Without more than a brief excerpt of Dr. Messer's pretrial report indicating that the doctor

would have testified to a potential connection between Atavan and respiratory arrest, and in light

of counsel's clear disassociation from this theory of defense, we must, albeit with some

reluctance, conclude that we do not have sufficient basis upon which to find that the exclusion of

the sedation protocol, or more widely any evidence of negligence, would have changed the

outcome of the proceedings.

### 3.  Ineffective Assistance of Counsel

Defendant next contends that his attorney provided ineffective assistance of counsel when

he failed to tender the hospital protocol to the State during pretrial discovery and acquiesced in

the court's ruling by failing to question Dr. Messer about any potential relationship between

Atavan and Smith's respiratory arrest.

The right of the accused to effective assistance of counsel is provided by the sixth and

fourteenth amendments of the United States Constitution.  U.S. Const., amends. VI,  XIV;

People v. Conley, 118 Ill. App. 3d 122, 127 (1983).  Whether defendant was denied effective

assistance of counsel is evaluated in accordance with the two-prong test set forth in Strickland v.

---

[14]We note that this statement by its breadth would have extended to the exclusion of the

hospital protocol alone, as the protocol could not have bolstered any theory of negligence if Dr.

Messer could not offer an opinion that negligence played a role in Smith's respiratory arrest.

No. 1-04-2709

Washington, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984); People v. Bloomingburg, 346 Ill. App. 3d 308, 316-17 (2004). Under Strickland, to prevail on a claim of ineffective assistance, defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance so prejudiced the defense as to deny defendant a fair trial. Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

As to the first prong of Strickland, defendant must overcome a strong presumption that, under the circumstances, the challenged action or inaction of counsel was a valid trial strategy. Bloomingburg, 346 Ill. App. 3d at 317; 3 W. LaFave, J. Israel & N. King, Criminal Procedure §11.10(c) at 715 (2d ed. 1999)). In determining the adequacy of defendant's legal assistance, a reviewing court will not consider isolated instances of alleged deficiencies but, rather, the totality of circumstances. People v. Long, 208 Ill. App. 3d 627, 640 (1990). Because effective assistance refers to competent and not perfect representation (People v. Odle, 151 Ill. 2d 168, 173 (1992)), mistakes in trial strategy or judgment will not, of themselves, render the representation incompetent (People v. Palmer, 162 Ill. 2d 465, 476 (1994)). Moreover, counsel's strategic choices will not constitute ineffective assistance simply because they were unsuccessful (People v. Milton, 354 Ill. App. 3d 283, 290 (2004)) or because another attorney may have pursued a different course of action (Palmer, 162 Ill. 2d at 476).

In the present case, defense counsel himself admitted that he inadvertently failed to tender the hospital protocol to the State prior to trial as required by Supreme Court Rule 413(c), thereby providing defendant with ineffective assistance of counsel. See People v. DeSimone, 9 Ill. 2d

50

522, 531 (1956) (concluding that defense counsel's lack of knowledge of basic rules of criminal procedure and evidence precluding him from presenting an adequate defense denied defendant effective representation). Moreover, even if we were not to take at face value defense counsel's explanation for failing to tender the hospital protocol in discovery, and instead relied on the trial court's determination that counsel's conduct was nothing but a subtle attempt at a "trial by ambush," we would still find defense counsel's conduct fell below the objective standard of reasonableness. See People v. Burns, 304 Ill. App. 3d 1, 11 (1999) ("deliberate violation of the discovery rules falls below the standard of reasonableness for professional assistance").

Moreover, we find that defense counsel's failure to attempt to undo the sanction so as to permit testimony with regard to the protocol, or at the very least to clarify that the sanction would not extend beyond the use of the protocol to ban any evidence of negligence would violate the first prong of Strickland. However, in light of counsel's disclaimer that Dr. Messer intended to opine that the faulty administration of Atavan was the cause of death, we must again conclude, albeit with some reluctance, that there is insufficient basis to hold that these failures by themselves so prejudiced defendant so as to deny him a fair trial. See Strickland, 466 U.S. at 687, 80 L. Ed. at 693, 104 S. Ct. at 2064 (to show prejudice under the second prong of Strickland, defendant must establish that but for counsel's actions, the result of his proceeding would have been different). Given Dr. Messer's clear statement, albeit in a brief excerpt of his report, that he was of the opinion that the victim's death was precipitated by the incorrect administration of Atavan, and given the trial court's and the State's insistence that they fully expected such an opinion to be proffered, the disclaimer of any such intention by defense counsel

is, to say the very least, surprising, but nevertheless precludes us from concluding that on this point counsel was ineffective. However, as shall more fully be discussed below, while we cannot predicate a finding of ineffective assistance of counsel on these factors alone, notwithstanding all contrary indications, we do find ineffective assistance in counsel's failure to give due regard to defendant's compulsion defense.

By way of brief background, the State's key witness in establishing defendant's complicity in the subject felony murder was codefendant Larry Hardy, who himself pleaded guilty and turned State's witness. The State called upon him to testify as to defendant's participation in the planning and execution of the crime. The record shows that in the middle of codefendant Hardy's cross-examination, defense counsel asked Hardy whether defendant had ever indicated that he did not want to be part of the armed robbery. Hardy replied in the affirmative and the following colloquy took place:

> "A [Hardy]: Right before we left, before we left out.
>
> Q [Defense counsel]: Right before you left your house to go tho the restaurant?
>
> A [Hardy]: Right when we was getting in the car?
>
> Q [Defense counsel]: What did [defendant] say or do?
>
> A [Hardy]: He just said he wasn't feeling it; he wasn't feeling right.
>
> Q [Defense counsel]: [Defendant] said he wasn't feeling it?
>
> A [Hardy]: Yes.

Q [Defense counsel]:  What did you take that to mean?

A [Hardy]:  That he was, you know, he was scared.

Q [Defense counsel]:  Who did he say that to?

A [Hardy]:  To Terrell Bell.

Q [Defense counsel]:  Who else was nearby?

A [Hardy]:  Me. Robinson.  It was just us.

Q [Defense counsel]:  Did one of you guys have the gun at that time?

A [Hardy]:  That's right before he gave it to me.  Bell had the gun.

Q [Defense counsel]:  What happened after [defendant] said he wasn't feeling it?

A [Hardy]:  Bell just told him that he was there when it started, he got to be there when it finished.

Q [Defense counsel]: Bell said, "You are there when it started.  You got to be there for the finish?"

A [Hardy]:  Yes.

Q [Defense counsel]:  And Bell had the gun at that point?

A [Hardy]:  Yes.

Q [Defense counsel]:  What did you guys do after that?

A [Hardy]:  That's when we got in the car."

As soon as defense counsel elicited this information, the trial court ordered a "recess in chambers." From the nature of the questioning, the trial court concluded that defense counsel's intention was to raise an affirmative defense of compulsion, which defense counsel admitted he did not include in his answer to discovery. The trial court stated that counsel's actions were a "discovery violation and perhaps further violation of the canons of ethics." In response, defense counsel explained that Hardy had presented him with this information about 1 ½ hours prior to his testimony at trial, during lunch and in the presence of Hardy's attorney, and that he "made a mistake by not filing or asking to file a compulsion defense" after he discovered this information. Defense counsel further explained:

> "I was under the mistaken presumption that I couldn't argue it unless I could prove it. Whereas in speaking with another lawyer as long as it can be raised, that's enough to file it. I wasn't aware of the distinction."

Concerned with counsel's conduct, the trial court "very reluctantly" allowed defense counsel to pursue this line of questioning and stated that it would "deal with *** arguments and defenses and *instructions* later." (Emphasis added.)

After the recess, on redirect examination, the State attempted to clarify the boundaries of Bell's threat. When the State asked Hardy whether Bell actually told defendant that he would harm him if he did not go through with the robbery, Hardy stated, "No. *** [But] [e]verybody, you know, I mean–well, I can't say everybody; but, we all know what it mean[t]." This ended Hardy's testimony. Defense counsel made no further efforts to question Hardy and during the instruction conference submitted no compulsion instruction.

54

Defendant now contends that his trial counsel's failure to raise the affirmative defense of compulsion and offer an instruction as to that defense constituted reversible error. We agree.

It is well settled in Illinois that counsel's choice of jury instructions, and the decision to rely on one theory of defense to the exclusion of others, is a matter of trial strategy. People v. Labosette, 236 Ill. App. 3d 846, 857 (1992); People v. Douglas, 362 Ill. App. 3d 65, 75 (2005). Accordingly, counsel's decision as to which jury instruction to tender can support a claim of ineffective assistance of counsel only if that choice is objectively unreasonable. Douglas, 362 Ill. App. 3d at 75. For the reasons that follow, we find that in the present case counsel's choice not to request a compulsion instruction fell below the objective standard of reasonableness.

Compulsion is an affirmative defense that would exculpate an accused, if the trier of fact believed that the elements of compulsion had been proven. 720 ILCS 5/7-11 (West 2002). We note that although a compulsion defense is generally not available to a defendant prosecuted for murder, the defense may be raised in a prosecution for felony murder. See People v. Serrano, 286 Ill. App. 3d 485, 490-92 (1997) (noting that if a defendant was compelled to commit the felony which is the predicate for a felony murder charge and during the commission of the felony, the person compelling him unexpectedly killed someone, such as the victim of the felon, defendant may rely on the defense of compulsion to the felony murder charge).

Compulsion requires that in committing the felony, defendant performed the charged offense under the threat or menace of imminent infliction of death or great bodily harm, which the person reasonably believed would be inflicted upon him if the conduct was not performed. See 720 ILCS 5/7-11 (West 2002). The defense is not available if the compulsion arises from negligence or fault of the defendant or if the defendant had ample opportunities to withdraw from

the criminal enterprise but failed to do so. People v. Scherzer, 179 Ill. App. 3d 624, 645-46 (1989). However, so long as the fear of great bodily harm is reasonable, a compulsion defense is available even where defendant may have been mistaken in his belief. People v. Adcock, 29 Ill. App. 3d 917.

To raise the affirmative defense of compulsion defendant "'must [only] present *some evidence* thereon.'" (Emphasis added). People v. Pegram, 124 Ill. 2d 166, 172 (1988) quoting Ill. Rev. Stat. 1983, ch. 38, par. 3-2(a); see also People v. Redmond, 59 Ill. 2d 328 (1974) (holding that the quantum of evidence necessary to raise an affirmative defense is that the evidence must be sufficient to raise an issue of fact for the jury creating a reasonable doubt as to defendant's guilt). After defendant raises the issue, the State is required to disprove the existence of the affirmative defense beyond a reasonable doubt. People v. Adcock, 29 Ill. App. 3d 917 (1975). Once defendant presents some "some evidence" which supports the affirmative defense, he is entitled to an instruction and it is error to refuse to instruct the jury on such a defense. See People v. Jones, 175 Ill. 2d 126, 131-32 (1997); see also People v. Kalpak, 10 Ill. 2d 411, 425 (1957) ("*very slight evidence* upon a given theory of the case will justify the giving of an instruction" (emphasis added)); People v. Carpentier, 20 Ill. App. 3d 1024 (1974) (holding that unless the evidence before the trial court is so clear and convincing to permit the court to find as a matter of law that there is no affirmative defense, the factual issue must be determined by the jury with proper instruction as to the law applicable).

The State would contend that the evidence was insufficient for a defense of compulsion because defendant did not withdraw from the robbery although he had an opportunity to do so when he exited the vehicle to scout out Taurus Flavors restaurant on Bell's command and

because in his videotaped confession he never claimed that he was threatened. We disagree.

In the present case, there was more than "some evidence" of compulsion presented at trial. The record indicates that the State's own witness, Hardy, testified that immediately before entering the car to go rob Taurus Flavors restaurant, 15-year-old defendant indicated to the adult Bell[15] that he "wasn't feeling it; he wasn't feeling right," about the robbery. Hardy testified that he understood this to mean that defendant was afraid. According to Hardy, Bell, who was holding the gun in his hand told defendant: "You [were] there when it started. You *got to be* there for the finish." (Emphasis added.) Despite the State's contention to the contrary, Hardy, the State's own witness, interpreted Bell's conduct as menacing, and testified "we all kn[e]w what it mean[t]." Thus, the evidence was sufficient to warrant a compulsion instruction and the consequent failure to tender that instruction constituted ineffective assistance of counsel, which if prejudicial, requires reversal. See Pegram, 124 Ill. 2d at 174 (holding that the failure of defense counsel to tender an instruction on the defense of compulsion and on the prosecution's burden of proof for that defense, where defendant did not deny he was present during the robbery, but testified that he was forced at gun point to lead the robbers to the victim, constituted ineffective assistance of counsel); see also Serrano, 286 Ill. App. 3d at 492 (holding that defense counsel was ineffective for presenting the compulsion defense to the jury without tendering an instruction informing the jury that the threats of harm made to the defendant could provide a legal defense, even though the defendant had given a court-reported statement admitting his guilt

---

[15]We also note that Bell was a convicted felon and a gang elder.

in the armed robbery).[16]

Given the fact that the evidence in this case was close, particularly with respect to the cause of death, we find that defendant was prejudiced by defense counsel's failure to request a compulsion instruction. In that regard, we note that in comparing the testimonies of Dr. Messer and Dr. Denton, Dr. Denton testified that he based his opinion on an autopsy performed by his colleague, which he only recalled reading, while he was uncertain whether he ever considered the "Code Blue Log," vital in determining the precipitating cause of death. Moreover, Dr. Denton's testimony was rejected by a different jury in the trial of codefendant, who was an adult and a far more active participant in the crime, even in the absence of expert testimony proffered by that codefendant. In addition, defendant in this case was a 15-year-old boy at the time of the armed robbery, who resided with an adult codefendant and whose participation in the armed robbery was that of the outside "look out." Under these circumstances, we cannot conclude that had the jury been instructed on the defense of compulsion, there was no reasonable probability that the outcome of the trial would have been different. See Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; see also Serrano, 286 Ill. App. 3d at 492-93 (holding that defendant was deprived of a fair trial when defense counsel failed to tender a jury instruction because there was a reasonable probability that being advised of the proper burden of proof, the jury could have

---

[16]Although there is a possibility that the court would have rejected the instruction for counsel's noncompliance with discovery, this would have occurred as a result of defense counsel's admitted failure to disclose this evidence and request a compulsion defense prior to trial. Either way, counsel would have been at fault for the failure.

been persuaded to conclude that defendant was compelled to commit the crime); Pegram, 124 Ill. 2d at 173-74 (court held that "'[f]undamental fairness includes *** seeing to it that certain basic instructions, essential to a fair determination of the case by the jury, are given.' [Citation.] ***[T]he omission [of a compulsion instruction] 'removed from the jury's consideration a disputed issue essential to the determination of defendant's guilt or innocence.' [Citation.]")

For the foregoing reasons, we reverse and remand

Reversed and remanded.

FITZGERALD SMITH, P.J., and O'MALLEY, J. concur.