NOTICE
Decision filed 04/01/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220755-U

NO. 5-22-0755

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 18-CF-1716 |
| | ) | |
| DANTE L. WADE, | ) | Honorable |
| | ) | Thomas E. Griffith Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Justices Moore and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Where the defendant's *pro se* postconviction petition failed to establish the gist of a constitutional violation, we affirm the trial court's order dismissing the petition at the first stage.

¶ 2    The defendant was charged with three counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2018)), alleging the defendant, without lawful justification and with the intent to kill or do great bodily harm, personally discharged a firearm that caused the death of Marcqui Apholone. See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2018). Following a jury trial, the defendant was found guilty of first degree murder and to have personally discharged a firearm that proximately caused the death of Apholone. The defendant filed a direct appeal, and the Fourth District affirmed his conviction and sentence. *People v. Wade*, 2022 IL App (4th) 200586-U (filed Apr. 20, 2022). On August 16, 2022, the defendant filed a *pro se* postconviction petition, which the trial court

1

dismissed after finding it was "frivolous or patently without merit." The defendant appeals from the trial court's summary dismissal of his postconviction petition at the first stage. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The facts contained herein have been largely extracted from the appellate court order on direct appeal. *Id.* At the defendant's jury trial, the State called Jasmine Wade, who testified that she is the defendant's daughter and, at the time of her testimony, was in jail for failing to appear in court despite being subpoenaed. In November 2018, Jasmine had been dating Apholone for about a year. On November 7, 2018, Jasmine and Apholone argued after she accused him of cheating. Jasmine had Apholone's phone, and he wanted it back. On November 8, 2018, Apholone confronted Jasmine while she attended class at Richland Community College, and the pair engaged in a physical altercation, during which Jasmine's acrylic nails were damaged or torn from her fingers, causing injury. Apholone took Jasmine's keys. When Jasmine later contacted Apholone and demanded her keys back, he said he would return her keys when she returned his phone. Jasmine went to her sister Shakeara's apartment and her father, the defendant, was there. She testified it was unusual for him to come to Decatur, and she had not seen him since December 2017. Defendant was upset when he saw Jasmine's injuries. Jasmine, Shakeara, the defendant, and her uncle, Ernest Brooms, who came along for "protection," drove to Apholone's house. The defendant was dropped off before they arrived at Apholone's house, but Jasmine could not remember why he got out of the vehicle. When they arrived, Jasmine started arguing with Apholone. After the defendant appeared, he and Apholone began fighting. Jasmine testified she saw the defendant point a gun at Apholone and pull the trigger. She was "100 percent" certain the defendant shot Apholone. Brooms got out of the car and ran off. While Shakeara drove away, the

2

defendant was acting "aggressively" and said, "I don't like dread heads. He's in the dirt." Jasmine did not see the defendant again until the day of her testimony at his jury trial.

¶ 5    Police interviewed Jasmine on November 9, 2018, and she told them she did not know anything about Apholone's murder. Jasmine returned on November 19, 2018, with counsel and gave a full interview, which she agreed was a "truthful statement." On cross-examination, Jasmine stated she was scared "in general." She testified someone had "shot at" Brooms and her mother's house and she believed the shots were related to Apholone's murder. Jasmine also agreed Brooms had previously fought boyfriends of his nieces.

¶ 6    Ernest Brooms testified he is Jasmine's uncle, and he has known the defendant, his sister's ex-husband, since he was five years old. On November 8, 2018, Brooms went with Jasmine, Shakeara, and the defendant to Apholone's house. He testified that the defendant asked him to join them so Brooms could "help" if Apholone brought friends out with him. Otherwise, Brooms planned to let the defendant and Apholone fight "one-on-one." When the group arrived at Apholone's house, Apholone was just pulling into the driveway, so they circled the block and dropped the defendant off a block away. At Apholone's house, Apholone and Jasmine got into an argument. Brooms jumped out of the car "to go make [Apholone] get his hands off [his] niece." The defendant showed up shortly after Brooms got out of the car. The defendant grabbed Apholone, "something" was said, and the defendant "started shooting." Apholone broke away, and the defendant chased him. Brooms testified the defendant fired the gun "[f]ive, six times maybe." He also stated the gun was a "black—a revolver," which he knew because he "know[s] guns."

¶ 7    Brooms testified that when he was first interviewed by police, he told them he did not know anything about the murder. He stated that he gave police a "truthful statement" during his second

3

interview. During cross-examination, Brooms confirmed he had previously fought the boyfriend of a different niece.

¶ 8     Shakeara Wade testified she is the defendant's daughter and Jasmine's older sister. Shakeara testified Apholone was dating her sister, but she did not know him well. On November 8, 2018, Jasmine called Shakeara and told her Apholone "had beat her up at school." She testified that she had not seen the defendant in over a year. After the defendant arrived in Decatur, Shakeara drove Jasmine and the defendant to meet Apholone to retrieve Jasmine's keys. Shakeara picked up Ernest Brooms, her uncle, on the way "for protection." Shakeara dropped the defendant off about a block from Apholone's house. She assumed he needed to use the restroom but could not recall if he told her that. Shakeara parked near Apholone's house, and Jasmine went to speak with him. While Jasmine was arguing with Apholone, Ernest got out of the car. Shakeara saw the defendant walk up to Apholone and believed Ernest and the defendant started fighting with Apholone. Shakeara heard "three or four" gunshots. Jasmine returned to the car upset. The defendant got in the car and told Shakeara to drive. Shakeara described the defendant as upset, angry, and "acting aggressive."

¶ 9     After his arrest, the defendant called Shakeara from jail and asked her not to come to court. He also asked her to encourage Jasmine to "stay low" and not come to court. The recordings of the phone calls were played for the jury.

¶ 10     Shakeara acknowledged on cross-examination that she originally gave investigators a different version of events. Investigators told her she would be arrested for murder, and she gave them a new version of events. She also confirmed she did not see the defendant with a gun and did not see anyone actually shoot Apholone. Shakeara explained on redirect she was scared when she was interviewed by police but the final version of events she provided was the truth.

4

¶ 11    Cassandra Bond testified she is the mother of Shakeara and Jasmine. On November 8, 2018, Bond left a message with the defendant that Jasmine had been hurt by her boyfriend. She stated that she did not ask the defendant to come to Decatur.

¶ 12    Stonee Adams testified that Apholone was his best friend and they had been friends since childhood. On November 7, 2018, after arriving at Adams's mother's house, Apholone realized he had left his phone in Jasmine's car when she dropped him off. Adams loaned Apholone a phone so he could locate Jasmine. He overheard Apholone speaking on the phone with Jasmine and reported the tone was "angry." The next day, November 8, 2018, Adams was with Apholone when he went outside to meet Jasmine. Adams could hear Apholone and Jasmine yelling at each other, "[g]oing back and forth three or four times, 'give me my phone, give me my keys.' " Adams heard Apholone say, " 'Okay, okay, man' " and then heard "five or six" gunshots. Adams heard a vehicle speed off. He ran outside but did not see Apholone or Jasmine.

¶ 13    George Yeaman testified that on November 8, 2018, he was sitting at his kitchen table when he heard gunshots. He looked out the window and saw a car drive away with a truck right behind it. Both vehicles were "getting out of there," and the truck was driving "[l]ike a bat out of hell." Yeaman saw a man wearing baggy clothes running across multiple yards down the street.

¶ 14    Laney Martin testified she heard a male and a female arguing. She then heard what sounded like a scuffle, followed by six gunshots, "a sequence of two rapid shots, single shot, single shot, and then two more rapid shots." Martin went outside and saw Adams, who approached her and said he was scared because he was on parole or probation. Adams used Martin's phone to call for a ride. Martin encouraged Adams to wait and give a statement to the police, which Adams did.

¶ 15    Vanessa Helms testified that she was dating the defendant in November 2018. On November 8, 2018, the defendant sent her a text message, saying his daughter was hurt and he

5

needed to go to Decatur. Helms drove him to Decatur from Joliet. They arrived at around 7 p.m., and Helms dropped the defendant off at an apartment complex then went to visit her own daughter. Helms visited with her daughter for approximately 45 minutes, and then went to get food. The defendant called and said he was ready to leave. Helms picked him up at the same apartment complex. She could not remember the exact time she picked the defendant up, but it was after 8 p.m. On the drive back to Joliet, they stopped at a Casey's gas station. The State played a video recording from a security camera at the Casey's gas station in Maroa, which showed the defendant at the station between 8:33 p.m. and 8:38 p.m. Helms testified the defendant was not acting any differently than he normally did on the drive back. Helms later learned that the defendant had been arrested for murder. The defendant called her from jail and the recording of the call was played for the jury.

¶ 16    Decatur police officer Timothy Wisniewski testified that on November 8, 2018, he responded at 7:44 p.m. to a call of shots fired with a possible gunshot victim. Officer Wisniewski located a deceased black male lying on his back in a driveway. There was a large pool of blood under his body and blood pooling around his head.

¶ 17    Decatur police officer Troy Kretsinger also responded to a call of shots fired with a possible gunshot victim. Officer Kretsinger went to the police station to retrieve equipment to process the crime scene and collect evidence. By the time Officer Kretsinger returned, it was actively raining. He quickly placed tent markers, photographed evidence, and collected items officers located at the scene, which included a blue University of Illinois stocking cap, a chewed piece of gum, hair braids or hair extensions consistent with the victim's hair, a Ford key fob, and a key chain with a lanyard with the name "Jasmine" on it. No casings or projectiles were recovered.

¶ 18    Detective David Dailey with the Decatur Police Department testified he specializes in the examination of cell phone records and cell phone data. Detective Dailey obtained a search warrant for the defendant's cell phone. The data from the cell phone showed the approximate latitude and longitude of the defendant's cell phone between 4:23 p.m. and 11:17 p.m. on November 8, 2018. Detective Dailey created a PowerPoint presentation of the location information, which was shown to the jury. From 4:23 p.m. to 6:32 p.m., the defendant's cell phone traveled from Joliet to Decatur. The defendant's cell phone then began traveling "down to the area general to the crime scene." The defendant's cell phone left Decatur at 7:55 p.m. and arrived back in Joliet at 11:17 p.m. Detective Dailey also confirmed the defendant's cell phone was in the approximate area of the Casey's in Maroa when the defendant was seen on the security camera at the gas station. On cross-examination, Detective Dailey explained the data is not global positioning system data and therefore does not provide an exact location.

¶ 19    Dr. Scott Denton testified he is a coroner's forensic pathologist and performed the autopsy on Apholone. Dr. Denton testified Apholone had six individual gunshot wounds, only one of which was fatal. Dr. Denton explained: "The only gunshot wound that would have caused death *** was the gunshot wound that went in the back of [Apholone's] left neck that got his carotid artery because that's a fatal wound that cause instantaneous large amount of bleeding, and then went up through the skull and exited the eye, so that was the fatal wound." Apholone would have remained conscious for "about 30 seconds to a minute and a half" after his carotid artery was severed and would have been able to move before he lost consciousness. The wound was also consistent with Apholone being in a bent down or bent forward position. Autopsy photos were presented to the jury.

¶ 20    Detective Appenzeller testified that he was the lead investigator for Apholone's homicide investigation. On November 29, 2018, Detective Appenzeller interviewed the defendant. Appenzeller informed the defendant they were investigating a November 8, 2018, homicide. The defendant responded that he received a text message from his ex-wife, Bond, about an emergency involving his daughters, Jasmine and Shakeara. The defendant contacted Shakeara, who told him "it was not a big deal." The defendant told Detective Appenzeller that he decided to go to Decatur and told Shakeara he was coming. However, the defendant's ride fell through, and he stayed in Joliet. The defendant learned of Apholone's murder the next day when he spoke to Shakeara. The defendant also told Detective Appenzeller that he did not get along with Brooms.

¶ 21    The parties stipulated (1) to the foundation for the recordings of the defendant's calls from jail, and (2) that Detective Ronald Borowczyk would testify he extracted data from Shakeara's cell phone and identified texts between Shakeara and the defendant.

¶ 22    At the close of the State's evidence, the defendant moved for a directed verdict, which was denied. The defendant called Detective Brad Hall, who testified that he interviewed Katherine Koenig, Brooms's mother, who said Brooms was with her at the time of the murder. The State's objection to Detective Hall's testimony as hearsay was sustained. The defendant called no other witnesses and chose not to testify in his own defense.

¶ 23    During deliberations, the jury requested the transcripts of phone calls the defendant placed from the jail. The trial court allowed jurors to look at the transcripts over the defendant's objection. The jury also requested a definition of "reasonable doubt," and the court instructed them to continue deliberating. Finally, the jury asked whether they could find the defendant guilty of first degree murder but find he did not personally discharge the firearm. The court referred the jury to

8

their instructions, after which they found the defendant guilty of first degree murder and found that the defendant personally discharged the firearm that proximately caused the death of Apholone.

¶ 24 The defendant filed a motion for judgment notwithstanding the verdict or a new trial, which was denied. The court then proceeded to sentencing. The defendant's presentence investigation report listed eight prior felony offenses and seven prior misdemeanor offenses.

¶ 25 Roger Craig, an investigator for the Macon County State's Attorney's Office, testified in aggravation that he obtained Illinois Department of Corrections (DOC) disciplinary records for the defendant. Craig testified that the defendant is affiliated with the Unknown Vice Lords gang and the defendant was found guilty of 15 different disciplinary infractions while incarcerated. On cross-examination, Craig acknowledged he did not know the extent of the defendant's involvement with the Unknown Vice Lords. Craig also agreed the defendant's disciplinary infractions were for rule violations, like wardrobe infractions, none of which would constitute crimes outside of a correctional facility.

¶ 26 Officer Kretsinger testified that he responded to a domestic incident involving the defendant in 2003. Cassandra Bond claimed the defendant shoved her to the ground and repeatedly punched her in the head, a story corroborated by Bond's mother and brother. The defendant admitted he told Bond he was going to kill her before knocking her to the ground. The defendant also stated he waited across the street for Bond to return home because he knew if she saw him waiting, she would drive by and not stop. Officer Kretsinger testified the defendant was arrested for the incident but did not know if the defendant was prosecuted for the offense and could not recall if he was called to testify about the incident. Officer Sean Bowsher testified to a separate domestic incident involving the defendant and Bond in 2005.

9

¶ 27    Officer Brian Allison testified that in 2005, a man named Terrimus Jackson reported the defendant fired a shot at him. The defendant was located close to the scene assaulting a woman named Juanita Goodwin. The defendant fled and was seen discarding a handgun, which was recovered and contained live rounds. The defendant admitted possessing and discarding the handgun, which was stolen. The defendant was sentenced to 20 years in DOC related to that incident. The defendant chose not to make a statement in allocution.

¶ 28    The State argued that the defendant was a "menace to society" and requested a sentence of life in prison. The defendant requested a sentence of 47 years in DOC, highlighting his intention of protecting his daughter.

¶ 29    The trial court "considered the facts of th[e] case, the factors in aggravation and mitigation, and the pre-sentence investigation report." Citing the defendant's "poor criminal history" and the defendant's failure to accept responsibility, the court sentenced the defendant to 60 years' incarceration—35 years for first degree murder with 25 years for the firearm enhancement. The defendant filed a motion to reconsider sentence, which was denied.

¶ 30    The defendant appealed to the Fourth District Appellate Court. On appeal, the Office of the State Appellate Defender (OSAD) filed a motion to withdraw as appellate counsel citing *Anders v. California*, 386 U.S. 738 (1967), on the ground that no meritorious issue could be raised in the appeal. The appellate court granted OSAD's motion and affirmed the defendant's conviction and sentence. *Wade*, 2022 IL App (4th) 200586-U.

¶ 31    On August 16, 2022, the defendant filed a *pro se* postconviction petition raising a claim of ineffective assistance of trial counsel for failing to request second degree murder jury instructions. In support of his claim, the defendant attached portions of the trial testimony of Laney Martin,

Shakeara Wade, Ernest Brooms, and Jasmine Wade in support of his claim. He argued that these witnesses testified that

> "on November 8, 2018, Jasmine was meeting her ex-boyfriend and asking him to return her cell phone, house keys and car keys which he took from her the day before. They began to argue and during that argument Mr. Apholone (ex-boyfriend) grabbed Jasmine and began to assault her. When defendant walked up and saw what was happening, he then quickly intervened in the middle of the assault and Mr. Alpholones [*sic*] aggression continued towards the defendant and they began to quarrel when defendant then shot Mr. Alpholone."

He also argued that Laney Martin's testimony showed that Jasmine was assaulted before the defendant intervened, and that the testimony of Brooms, Jasmine, and Shakeara revealed that the defendant was not the aggressor and he only reacted to Apholone's aggression toward Jasmine with the knowledge Apholone had battered Jasmine the day before. The defendant also argued that he "acted in a sudden and intense passion in protecting his daughter resulting from the serious provocation by Mr. Apholone, and/or the defendant subjectively believed that he was acting in defense of his daughter, but his belief was unreasonable."

¶ 32    On November 4, 2022, the trial court summarily dismissed the petition stating that the trial evidence was clear:

> "[The Defendant] ambushed the victim and shot the victim approximately six times and the victim was not armed. In addition, the record reflects that the Defendant's position at trial was that he had nothing at all to do with the shooting and the State was therefore not able to meet its burden of proof beyond a reasonable doubt. The Defendant is now attempting to 'bootstrap' a Second Degree Murder instruction where, again, the facts

11

adduced by the State do not support such an instruction and the Defendant's position at trial was contrary to the giving of such instruction."

From the dismissal of his postconviction petition, the defendant filed the instant appeal.

¶ 33                                    II. ANALYSIS

¶ 34    The defendant argues that the trial court erred when it dismissed his *pro se* postconviction petition at the first stage, contending that his petition sufficiently alleged the "gist" of a constitutional claim that his trial counsel was ineffective for failing to request a second degree murder jury instruction.

¶ 35    The Post-Conviction Hearing Act (Act) provides a mechanism by which persons under a criminal sentence in Illinois can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution, the Illinois Constitution, or both. 725 ILCS 5/122-1 *et seq.* (West 2020); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). The purpose of the postconviction proceeding is to allow inquiry into constitutional issues involved in the original conviction and sentence that have not been, and could not have been, adjudicated previously on direct appeal. *People v. Blair*, 215 Ill. 2d 427, 443-44 (2005). Proceedings under the Act are commenced by the filing of a petition in the circuit court in which the original proceedings occurred. 725 ILCS 5/122-1 (West 2020). The petition need only present the "gist" of a constitutional claim. *Hodges*, 234 Ill. 2d at 9.

¶ 36    The Act establishes a three-stage process for adjudicating a postconviction petition. *Id.* at 9-10. During the first stage, the circuit court must independently determine whether the allegations in defendant's petition are frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2016). A postconviction petition is frivolous or patently without merit only if it has no arguable basis either in law or in fact. *Hodges*, 234 Ill. 2d at 16. A claim has no arguable basis in law or fact

12

if it is "based on an indisputably meritless legal theory," such as one that is "completely contradicted by the record," or "a fanciful factual allegation," including "those which are fantastic or delusional." *Id.* at 16-17. The phrase "frivolous or *** patently without merit" also encompasses forfeiture. *People v. Blair*, 215 Ill. 2d 427, 445 (2005). The circuit court's summary dismissal of a defendant's postconviction petition is reviewed *de novo*.

¶ 37 Issues raised in a postconviction petition which could have been raised on appeal, but were not, are forfeited. *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010). In *Petrenko*, the defendant claimed ineffective assistance due to trial counsel's failure to contest the validity of a search warrant. *Id.* at 497. Petrenko's claim was based entirely on facts contained in the trial court record, so the defendant could have raised it on direct appeal. *Id.* at 499. Because he did not, the court found the claim of ineffective assistance of trial counsel to be "clearly forfeited." *Id.* at 498.

¶ 38 On direct appeal in the instant case, defendant's appellate counsel identified three potential issues: (1) whether the trial court complied with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012); (2) whether the defendant was proven guilty beyond a reasonable doubt; and (3) whether his sentence was an abuse of discretion. *Wade*, 2022 ILL App (4th) 200586-U, ¶ 54. Appellate counsel concluded none of those issues had arguable merit, and the court agreed, granting counsel's motion to withdraw. *Id.* ¶¶ 54, 73. Appellate counsel's choice not to raise any claim of ineffective assistance of trial counsel on direct appeal was a clear determination that the issue currently before this court lacked an arguable basis at that time.

¶ 39 The defendant asserted in his *pro se* postconviction petition that the evidence supporting his claim came from the trial testimony of Ernest Brooms, Jasmine Wade, Shakeara Wade, and Laney Martin. In support of that contention, the defendant attached excerpts of the trial transcripts of each of those witnesses. Indisputably, the testimony allegedly supporting the giving of a second

13

degree murder jury instruction was contained in the trial court record. The defendant's *pro se* petition fails to assert the existence of any evidence or witnesses beyond the record which would support his claim that he was acting in self-defense. As in *Petrenko*, the evidence to allegedly support the defendant's claim for a second degree murder jury instruction was in the trial record and available at the time he appealed his conviction. Because the defendant could have asserted this issue on direct appeal but did not, he clearly forfeited this issue.

¶ 40    The defendant acknowledges that since there are no facts in the record to show that he considered or discussed, much less requested, a second degree murder jury instruction, there was an insufficient basis for appellate counsel to raise this issue on direct appeal. He seeks to avoid forfeiture by arguing that since he has "implicitly" admitted to shooting Alpholone for the first time in his *pro se* postconviction petition, the record now contains a sufficient basis for this court to address the merits of his claim. The defendant's attempt to secure a second bite of the apple by now changing his trial strategy utterly fails to escape the application of forfeiture.

¶ 41    The doctrine of forfeiture may be relaxed where fundamental fairness so requires, where the forfeiture stems from appellate counsel's ineffective assistance, or where the facts relating to the issue do not appear in the original appellate record. *People v. English*, 2013 IL 112890. As argued *supra*, the defendant concedes the testimony which he alleges provided a factual basis for a second degree murder jury instruction was contained in the record on direct appeal. He also concedes that appellate counsel did not provide ineffective assistance as to this issue. Since the defendant fails to argue that fundamental fairness requires relaxation of the forfeiture doctrine, we conclude that the issue raised by the defendant in this appeal is forfeited. However, because the forfeiture rule is a limitation on the parties, and not a jurisdictional limitation on a reviewing court, we decline to apply forfeiture, and choose to address the merits of the defendant's argument that

14

trial counsel was ineffective for failing to request a second degree murder jury instruction. *People v. Chapman*, 379 Ill. App. 3d 317, 326 (2007).

¶ 42    In determining whether defendant has asserted an arguable claim of ineffective assistance of counsel, our courts apply the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our Illinois Supreme Court in *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). Under *Strickland*, a defendant must show that counsel's performance fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 687-88; *Albanese*, 104 Ill. 2d at 525. During the first stage of the postconviction proceedings, a petition alleging ineffective assistance of counsel may not be summarily dismissed if it is arguable that counsel's performance fell below an objective standard of reasonableness, and it is arguable that defendant was prejudiced. *Hodges*, 234 Ill. 2d at 17.

¶ 43    Reasonableness must be based on the case at issue, viewed at the time of the conduct, and not in hindsight after an adverse judgment. *Strickland*, 466 U.S. at 687, 700. "[M]istakes in trial strategy or tactics or in judgment do not of themselves render the representation incompetent" nor does the fact that another attorney with the benefit of hindsight would have handled the case differently. (Internal quotation marks omitted.) *People v. West*, 187 Ill. 2d 418, 432 (1999) (quoting *People v. Hillenbrand*, 121 Ill. 2d 537, 548 (1988)); *People v. Young*, 341 Ill. App. 3d 379, 383 (4th Dist. 2003). As such, the court must consider in totality all the circumstances of counsel's performance, his action or inaction, at the time of the performance, while "indulg[ing] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" or merely trial strategy. *Strickland*, 466 U.S. at 688-89; *Young*, 341 Ill. App. 3d at 383.

15

¶ 44    It is presumed that defense counsel pursues sound trial strategies, a presumption that can be overcome only by showing that "no reasonably effective criminal defense attorney, facing similar circumstances, would pursue such strategies." *People v. Faulkner*, 292 Ill. App. 3d 391, 394 (5th Dist., 1997). Counsel's trial strategy must be more than just unsuccessful to overcome the presumption that it was sound. *Id.* Unless defense counsel's strategy was so unsound as to preclude meaningful adversarial testing, trial strategy decisions are generally immune to claims of ineffective assistance of counsel. *People v. Enis*, 194 Ill. 2d 361, 378 (2000). Deciding which theory of defense to pursue is a matter of trial strategy, and counsel has the ultimate authority to decide trial strategy. *People v. Guest*, 166 Ill. 2d 381, 394 (1995). Additionally, a strong presumption exists that defense theory decisions are sound trial strategy rather than incompetence. *People v. Patterson*, 2022 IL App (1st) 182542, ¶ 65.

¶ 45    "It is well settled in Illinois that counsel's choice of jury instructions, and the decision to rely on one theory of defense to the exclusion of others, is a matter of trial strategy." *People v. Sims*, 374 Ill. App. 3d 231, 267 (2007). "Accordingly, counsel's decision as to which jury instructions to tender can support a claim of ineffective assistance of counsel only if that choice is objectively unreasonable." *Id.*

¶ 46    Whether defendant's argument that trial counsel was ineffective for failing to request a second degree murder jury instruction is meritless focuses on his theory of defense at trial and whether the evidence adduced at trial supported the giving of such an instruction. Raising the affirmative defense of self-defense or defense of others requires a defendant to admit he committed the act for which he is being prosecuted. *People v. Cacini*, 2015 IL App (1st) 130135, ¶ 44. The defendant never admitted to killing Apholone before, during, or after trial, and failed to do so on direct appeal. His defense at trial was that he had nothing to do with Apholone's murder, and he

16

was not even present at the crime scene, having remained in Joliet on the night of the murder. From the time the defendant was interviewed by the police, through pretrial discovery, opening statement, trial testimony, closing argument, sentencing, and direct appeal, the defendant never wavered from advancing the legal theory that he was innocent of Apholone's murder. The defendant made the strategic decision to provide an opportunity for acquittal, rather than risk being convicted of the lesser offense of second degree murder. Given the fact that during his interview with police the defendant maintained his innocence, claiming he was in Joliet at the time of the murder, we cannot find that this trial strategy was objectively unreasonable.

¶ 47    Defendant asserts that the physical confrontation between the murder victim and his daughter Jasmine, and also between the victim and himself, warranted the jury instruction because he was acting under an unreasonable belief in the need for self-defense of himself or others or was under serious provocation. A defendant is entitled to a self-defense jury instruction if there is even very slight evidence supporting his theory. *People v. Washington*, 2012 IL 110283, ¶ 43. "The question of whether sufficient evidence exists in the record to support the giving of a jury instruction is a question of law subject to *de novo* review." *Id.* ¶ 19.

¶ 48    We turn to the elements of second degree murder in order to further evaluate the defendant's claim that trial counsel was ineffective for failing to seek the applicable jury instruction. A person commits second degree murder when he commits first degree murder and either (1) "is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he or she negligently or accidentally causes the death of the individual killed" or (2) "believes the circumstances to be such that, if they existed, would justify or exonerate the killing \*\*\*, but his \*\*\* belief is unreasonable." 720 ILCS 5/9-2(a) (West 2016).

17

¶ 49    For an unreasonable belief in self-defense, the defendant must prove by a preponderance of the evidence the following "six elements to a claim of self-defense: (1) force was threatened against the defendant, (2) the defendant was not the initial aggressor, (3) the risk of harm was imminent, (4) the threatened force was not lawful, (5) the defendant subjectively believed that the use of force was necessary to avert the danger, and (6) the defendant's belief was objectively reasonable." *People v. Hampton*, 2021 IL App (5th) 170341, ¶ 95. However, an individual claiming self-defense is not allowed to pursue and inflict injury upon an initial aggressor after the argument is abandoned by the aggressor. *People v. Guja*, 2016 IL App (1st) 140046, ¶ 54 (citing *People v. Holman*, 2014 IL App (3d) 120905, ¶ 58).

¶ 50    The evidence at trial clearly established that at the time of the murder the victim was not in possession of a weapon of any kind. To answer the question of whether the record supported the existence of the required elements of self-defense, we need look no further than the following statement by the trial court:

> "[The Defendant] ambushed the victim and shot the victim approximately six times and the victim was not armed. In addition, the record reflects that the Defendant's position at trial was that he had nothing at all to do with the shooting and the State was therefore not able to meet its burden of proof beyond a reasonable doubt. The Defendant is now attempting to 'bootstrap' a Second Degree Murder instruction where, again, the facts adduced by the State do not support such an instruction and the Defendant's position at trial was contrary to the giving of such instruction."

After reviewing the entire record, we find that trial counsel's decision to avoid the Sisyphean task of securing a second degree murder jury instruction was objectively reasonable. Accordingly, we agree with the trial court's finding that the defendant's postconviction petition had no arguable

18

basis either in law or fact, and was thus, frivolous and patently without merit. *Hodges*, 234 Ill. 2d at 16.

¶ 51                                  III. CONCLUSION

¶ 52    For the foregoing reasons, the judgment of the circuit court of Macon County is hereby affirmed.


¶ 53    Affirmed.